**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| BRENT GANGER, as Trustee for the Next of Kin of RENEE NICOLE MACKLIN GOOD, Deceased, and REBECCA GOOD,<br><br>Plaintiffs,<br><br>v.<br><br>JONATHAN ROSS, individually; STEPHEN MILLER, individually; KRISTI NOEM, individually; COREY R. LEWANDOWSKI, individually; THOMAS D. HOMAN, individually; TODD LYONS, individually; GREGORY BOVINO, individually; and JOHN DOE FEDERAL AGENTS 1–10, individually,<br><br>Defendants. | Case No. ________________<br><br>**COMPLAINT** |

## INTRODUCTION

1. On the morning of January 7, 2026, Renee Nicole Macklin Good ("Renee"), a thirty-seven-year-old United States citizen, poet, and mother of three, dropped her six-year-old son off at school, drove home through her own south Minneapolis neighborhood, and stopped her car in the middle of Portland Avenue. Federal immigration agents were operating there. They were masked, as was their practice throughout Operation Metro Surge. Renee honked her horn to warn her neighbors. Her partner got out and began to film. Renee stayed behind the wheel. She was not the target of any investigation, and she was breaking no law that any federal officer had authority to enforce. Numerous vehicles,

including the unmarked Chevrolet Tahoe driven by Defendant Jonathan Ross, drove around her stopped car without incident.

2. After passing Renee, Ross got out of that Tahoe with his own phone in hand, already recording. He circled Renee's car, filming. He walked past her open driver's window, and she spoke to him: "That's fine dude. I'm not mad at you. I'm not mad at any of you." Two more agents pulled up on the other side of her car. Renee waved them around and told them, "just go around." Instead they got out and one of them shouted, "Out of the car. Get out of the fucking car."

3. Renee turned her wheels away from Ross and began to pull slowly forward. Ross stepped sideways. He then leaned forward toward it, drew his gun, and fired a round through the bottom left of her windshield. As Renee's car continued its slow turn away from him, he fired twice more through her open driver's window. One of those two rounds entered Renee's left temple. As her car careened out of control down Portland Avenue and crashed into a parked car, Ross cursed, "fucking bitch."

4. No agent rendered aid. When a bystander offered to help, an agent told him, "No, back up, now!" When the man said he was a physician, the agent answered, "I don't care." Renee Good was pronounced dead at Hennepin County Medical Center at 10:30 a.m. The Hennepin County Medical Examiner recorded the manner of death as homicide, the cause of death as multiple gunshot wounds, and, as to how the injury occurred, that the decedent was shot by a law enforcement officer.

5. Renee's partner, Rebecca ("Becca") Good, was standing a few feet from the car when Ross fired into it. Becca was beside the front passenger door when the agents

ordered Renee out of the car, and a few feet from the rear passenger-side taillight when the shots were fired past her. She ran down the street after Renee's car and found her partner bleeding from a gunshot wound to the head. Becca has suffered immensely as a result of the unlawful shooting and killing of her partner, and she has been diagnosed with post-traumatic stress disorder. She is a plaintiff in this action in her own right.

6. Ross's shots were the predictable and intended product of the operation that put him on Portland Avenue. His conduct was in furtherance of a carefully planned, coordinated effort between senior federal officials and private actors to make two ethnic communities in Minnesota – Minnesotans of Somali and Hispanic descent and origin – the object of aggression and abduction, and to silence, by intimidation, arrest, and violence, the neighbors and allies of those targeted communities who observed, documented, and warned of that campaign.

7. Plaintiffs bring this action under 42 U.S.C. §§ 1985(3) and 1986, the Ku Klux Klan Act of 1871; under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971); and, as to Defendant Ross and the John Doe Federal Agents, under the laws of the State of Minnesota.

8. On November 19, 2025, six weeks before Renee Good was killed by a federal agent, Christopher Rufo and Ryan Thorpe published a report in *City Journal*, a publication of the Manhattan Institute, asserting that Minnesota taxpayers were the largest funder of the Somali terrorist organization al-Shabaab. The terror-financing claim rested on a single named source, retired Seattle detective Glenn Kerns, who later said the story was

"bullshit," said he had been misquoted, and confirmed that he had never traveled to Minnesota to investigate anything.

9. Rufo's intended audience was President Donald Trump. Within hours of publication, he began posting on X that "Somalis are stealing billions of dollars from American taxpayers," and he called on the President to revoke Temporary Protected Status for every Somali national in the country. He then repeated that demand on Fox News' primetime program. By his own published account: "on Laura Ingraham's program, I summarized the piece and called on President Trump to revoke Temporary Protected Status (TPS) for all Somalis in Minnesota. Within hours, the president, who had been following the story, announced that he would revoke TPS for all Somali recipients."

10. The President did exactly that on the night of November 21, 2025, announcing on Truth Social that he was terminating Somali Temporary Protected Status effective immediately, asserting without evidence that Somali gangs were terrorizing Minnesota, and directing, of Somalis: "Send them back to where they came from." Six days later, on Thanksgiving night, he blamed refugees, including Somalis in Minnesota, for "social dysfunction in America." On December 2, closing a televised Cabinet meeting, he repeatedly called Somali immigrants "garbage" and said, "we're going to go the wrong way if we keep taking in garbage into our country." "Their country stinks." "When they come from hell, they complain . . . ." That same day, Defendant Thomas D. Homan, the border czar, announced that immigration enforcement in Minnesota would increase, vowing that the administration would enforce the immigration laws "without apology," including in the Twin Cities. The next morning, as street-level enforcement began in the

Twin Cities, the President declared from the Oval Office that Minnesota was "a hellhole right now. The Somalians should be out of here."

11. Operation Metro Surge – the conspiracy at the center of this action – launched in early December 2025, targeting Minnesotans of Somali descent from the outset. The choice of target made little sense on its own terms. Minnesota's Somali community is overwhelmingly made up of American citizens. Over ninety percent of Somalis in America are United States citizens who are not subject to immigration enforcement. The operation's architects wanted footage of enforcement against Somali people to satisfy the President's desire to harm an entire community based on race and national origin.

12. Operation Metro Surge was a direct product of the President's unmistakable animus toward people of Somali origin. Every escalation of the campaign followed, by hours or days, a public statement by the President expressing contempt for people of Somali origin. Each escalation was a direct response to President's denigrations. When the operation had run its course, the White House described the arrests as having been made "since President Donald J. Trump launched Operation Metro Surge." The President directed the Department of Homeland Security against Minnesota's Somali community by name, and the Department acted in response to the President's demands.

13. Nick Shirley is a then-twenty-three-year-old content creator with no journalism background who had built an audience by confronting immigrants of color on video: Haitians in Springfield, Ohio; Venezuelans in Aurora, Colorado; African street vendors on Canal Street; and, in July 2025, Muslims in Minnesota, in a video on the rise

of Islam in the United States and what it called Minnesota's Somali takeover, which made a spectacle of the Muslim call to prayer. By 2025 the administration had already made Shirley part of its enforcement apparatus: it seated him at a White House roundtable with the President in October 2025, and gave him an ICE ride-along in Chicago during Defendant Bovino's "Midway Blitz" surge there, where he interviewed a detainee in the back seat of a federal vehicle and published the resulting video under the title *Nick Shirley Deports Migrants with ICE*.

14. On December 26, 2025, Shirley posted a forty-two-minute video claiming that roughly ten Somali-run day care centers had stolen more than $110 million in taxpayer money. Shirley's *modus operandi* was to knock on doors at midday, film locked doors and blacked-out windows, and infer theft from the absence of visible children or lack of footprints in the snow. Within days, the video was refuted by the State of Minnesota and by the press: Minnesota's child-services commissioner, Tikki Brown, confirmed that all ten featured facilities had been inspected within the prior six months and that the State's ongoing investigations of several of them had uncovered no findings of fraud; state inspectors visited nine of them and found children present at eight, the ninth not yet open for the day; CBS News found active licenses, recent unannounced inspections, and no recorded evidence of fraud; and the Star Tribune walked into four of the facilities and found children napping and playing.

15. The federal government embraced Shirley's video anyway. Three days after it posted, Defendant Noem announced that federal agents were carrying out a massive investigation into childcare and other rampant fraud in Minneapolis, and her Department

announced that its investigators were going door to door at suspected fraud sites and would make arrests. On January 2, 2026, the same day the State announced that the featured day cares had recently been found to be operating as expected, the White House published an official release stating that the administration's Minnesota campaign was "[f]ueled by shocking video from Nick Shirley and tenacious reporting by Alpha News exposing the Somali-dominated scams that have bled taxpayers dry." The White House's statement also tallied the criminal defendants in Minnesota fraud cases by ethnicity, asserting that of ninety-eight people charged, eighty-five of them were of Somali descent.

16. The White House purported to answer the alleged fraud not with forensic fraud investigations, but instead a rapid deployment of armed immigration agents acting to terrorize Minneapolis's Somali and Latino communities. Beginning January 4, 2026, DHS deployed approximately 2,100 additional personnel to the Twin Cities (1,500 enforcement and removal officers and 600 Homeland Security Investigations agents). Defendant Lyons went on Newsmax to call it the agency's "largest immigration operation ever."

17. Nothing about this resembled legitimate or lawful immigration enforcement. The Twin Cities were occupied by three to four thousand masked, armed, camouflaged federal agents who roved the streets stopping people because of how they looked. They wore masks and mismatched vests, displayed no names or badge numbers, refused to identify themselves, drove unmarked cars with switched, missing, or falsified license plates, and demanded that United States citizens prove they were not, in the agents' words, illegal.

18. A federal judge, after a full evidentiary hearing concerning the conduct of Operation Metro Surge, found that the plaintiffs before him had made "a clear showing that Defendants have adopted a policy authorizing federal immigration officers to conduct investigatory stops based on ethnicity or race without reasonable suspicion," that "[t]he evidence from individual encounters is compelling and troubling," that agents "approached people on the street, or pulled them over in their vehicles, and requested identification without any explanation for why the stop occurred and often without identifying themselves," and that agents "stopped Somali and Hispanic individuals without reasonable suspicion while they did not stop similarly situated nearby white individuals."[1]

19. The operation's evident animus reached beyond Somalis. The same officials who decried Somali Minnesotans as an enemy population had spent a decade denigrating Hispanic immigrants in identical terms, as criminals, as invaders, as people "poisoning the blood of our country." The operation they designed for Minneapolis swept both communities together. Its architects and its field commander had run the same tactics against Latino neighborhoods in Los Angeles and Chicago in the months immediately preceding, and federal courts had already found those tactics to rest on apparent ethnicity. In Minnesota, DHS agents patrolled the Lake Street corridor and the predominantly Latino neighborhoods of south Minneapolis and the West Side of Saint Paul in the same manner they patrolled Cedar-Riverside and Karmel Mall.

[1] Findings of Fact, Conclusions of Law, and Order, *Hussen v. Noem*, No. 0:26-cv-00324-ECT-ECW (D. Minn. Mar. 9, 2026) (Tostrud, J.),

20. When the arrest data were finally produced, they showed who had actually been formally arrested for immigration violations during Operation Metro Surge: Ecuador accounted for 1,026 arrests and Mexico for 885, while Somalis were fewer than three percent of the total. Of the thousands arrested between December 1, 2025, and March 10, 2026, approximately 106 people were Somali. Of more than 3,500 people arrested, exactly two were deported to Somalia.

21. In terms of investigating fraud and terror funding, Operation Metro Surge accomplished nothing—because investigating such crimes was not its true aim. Instead, Operation Metro Surge was designed to be a violent and discriminatory campaign targeted at Minnesotans on the basis of race and national origin. The campaign produced two dead Americans, a third person shot, a fourth dead in Texas detention, and more than $200 million in economic damage to a single city.

22. Renee was one those casualties. She was killed on a public street, while doing what thousands of her neighbors were doing that winter: watching masked, armed men terrorizing her community and refusing to look away.

23. Without conducting any inquiry or investigation, the federal government immediately blamed Renee for her own death and absolved Jonathan Ross of all responsibility. Within hours, Defendant Noem told reporters that Renee had committed an act of domestic terrorism: “Domestic acts of terrorism like this will not stand.” DHS’s Assistant Secretary for Public Affairs, Tricia McLaughlin, called Renee a “violent rioter” who “weaponized her vehicle.” Without basis, the President called her a “professional agitator” who “violently, willfully, and viciously ran over the ICE Officer.” The Vice

President said she was "brainwashed," a "victim of left-wing ideology," and that her death was "a tragedy of her own making." Defendant Bovino said the shooter "had no clue that that was going to happen, but he was put into that violent situation and reacted when a 4,000-pound missile came right at him."

24. As the federal government branded Renee a terrorist and declared that Ross had done nothing wrong, it moved to hide the evidence of what actually occurred on Portland Avenue. On the morning of the shooting, the FBI and the Minnesota Bureau of Criminal Apprehension ("BCA") agreed to a joint investigation, as is standard in officer-involved deaths. By that evening the United States Attorney had reversed course; BCA investigators were excluded from the interviews at the Whipple Federal Building, denied the names of the officers involved, and cut off from the vehicle and its contents, the shell casings, and the firearm. Renee and Becca's car was removed from the scene before local investigators could process it. The Deputy Attorney General, Todd Blanche, announced: "We investigate when it's appropriate to investigate. And that is not the case here. . . . So no, we are not investigating." Numerous federal prosecutors resigned, and an FBI agent resigned after being pressured to abandon a civil rights inquiry into Ross in favor of an investigation of Becca instead.

25. Congress enacted 42 U.S.C. §§ 1985(3) and 1986 in 1871 to address precisely this scenario: the acts of individuals who ride the public roads with their faces covered, to strip a despised group of the equal protection of the laws, and conspiracies to accomplish the same. Section 1985(3) reaches conspiracies, including those in which private and governmental actors act together, and it separately reaches those who "go in

disguise on the highway or on the premises of another" for the purpose of depriving a protected class of equal protection. Both branches are pleaded here.

26. Plaintiff Brent Ganger is Renee Good's brother and the trustee appointed by the Minnesota District Court for the Fourth Judicial District to bring claims on behalf of her next of kin. He sues on behalf of her three children (ages fifteen, twelve, and six at the time of her death), her parents, and her siblings. Plaintiff Rebecca Good sues in her own right for the injuries the same conduct inflicted on her. Together they seek compensatory and punitive damages, and a judgment that the killing of Renee Good was an act in furtherance of an unlawful agreement to deny two entire groups the equal protection of American law.

**JURISDICTION AND VENUE**

27. This action arises under 42 U.S.C. §§ 1985(3) and 1986 and the Fourth Amendment to the United States Constitution. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(1) and (a)(2) (recovery of damages for injuries caused by conspiracies described in section 1985).

28. The claims against Defendant Ross for excessive force arise directly under the Fourth Amendment pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), which recognized an action for damages against federal officers who conduct an unreasonable search or seizure, the same context presented here.

29. Plaintiff Brent Ganger's capacity to sue is conferred by Minn. Stat. § 573.02, subds. 1–3, and by the Order for Appointment of Trustee entered January 30, 2026, in Hennepin County District Court.

30. Plaintiff Rebecca Good sues in her own right and not in a representative capacity. Her federal claims arise under 42 U.S.C. §§ 1985(3) and 1986, and her Minnesota tort claims for intentional and negligent infliction of emotional distress are within this Court's jurisdiction under 28 U.S.C. §§ 1331 and 1367(a). Those tort claims seek to remedy violations of the Constitution of the United States within the meaning of 28 U.S.C. § 2679(b)(2)(A).

31. This Court has jurisdiction over Plaintiffs' Minnesota tort claims against Defendant Ross and the John Doe Federal Agents under 28 U.S.C. § 1367(a). Those claims arise from the same case or controversy as Plaintiffs' federal claims, and each is brought for a violation of the Constitution of the United States within the meaning of the exception to the Westfall Act's exclusive-remedy provision, 28 U.S.C. § 2679(b)(2)(A), as pleaded more fully below.

32. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and (e)(1). A substantial part of the acts and omissions giving rise to these claims (including the shooting of Renee Nicole Macklin Good on Portland Avenue in Minneapolis, Hennepin County, Minnesota, and the execution of Operation Metro Surge) occurred in this District.

## THE PARTIES

### Plaintiffs

33. **Brent Ganger** is a natural person and the brother of Renee Nicole Macklin Good. On January 30, 2026, on his petition under Minn. Stat. § 573.02, subd. 3 and Minn. Gen. R. Prac. 144, the Honorable Karen Janisch of the Minnesota District Court for the Fourth Judicial District, Hennepin County, appointed him trustee for the next of kin of Renee Nicole Macklin Good. He brings this action in that capacity for the exclusive benefit of the decedent's next of kin.

34. **Plaintiff Rebecca (Becca) Good** is a natural person and a resident of Minnesota. She was Renee Good's partner. They moved to Minneapolis together, lived together, and were together raising Renee's six-year-old son. On January 7, 2026, she was present on Portland Avenue, standing within a few feet of their vehicle, when Defendant Ross fired three rounds into it and killed Renee. She sues in her own right for her own injuries.

35. **Renee Nicole Macklin Good**, the decedent, was born April 2, 1988, and was thirty-seven years old on the day she was killed. She was a United States citizen, born in Colorado. She lived in south Minneapolis with her partner, Becca Good, and her six-year-old son. She was a poet who won a prestigious poetry prize in 2020; she was preparing to pursue a master's degree in English; she was a member of the school board at her son's school and had recently applied to substitute-teach there. She had no criminal history. Her next of kin are her three minor children, S.S., R.S., and E.M.; her mother, Donna Ganger;

her father, Timothy Ganger; her brothers Brent, Quinten, and Luke Ganger; and her sister, Anna Collins.

**Defendants**

36. **Defendant Jonathan Ross** was, at the time of the incident, a Deportation Officer or comparable officer of U.S. Immigration and Customs Enforcement, assigned to or detailed with the Enforcement and Removal Operations directorate and its special response team. On January 7, 2026, Ross was deployed in Minnesota as part of Operation Metro Surge. He fired the shots that killed Renee Good. He is sued in his individual capacity.

37. **Defendants John Doe Federal Agents 1–10** are federal law enforcement officers of ICE, U.S. Customs and Border Protection, or another component of the U.S. Department of Homeland Security who were present at Portland Avenue in Minneapolis on the morning of January 7, 2026, including without limitation the two agents who stopped their vehicle alongside Renee Good's vehicle, ordered her out of her car, and attempted to open her driver's door, and the agent who refused a physician's offer of medical aid. Their identities are unknown to Plaintiffs because they concealed their faces and identities, wore no individual identification, and because the federal government has refused to disclose the names of the officers involved. They are sued in their individual capacities. Plaintiffs will amend to name them when their identities are ascertained.

38. **Defendant Stephen Miller** is the White House Deputy Chief of Staff for Policy and the Homeland Security Advisor to the President. He is the architect of the administration's anti-immigration policy. He is sued in his individual capacity.

39. **Defendant Kristi Noem** led the Department of Homeland Security as its Secretary during Operation Metro Surge, until March 2026, and commanded the Department that designed and executed the operation. She was removed as Secretary in March 2026 amid the fallout from the Department's killings of Renee and Alex Pretti. She is sued in her individual capacity.

40. **Defendant Corey R. Lewandowski** is a natural person who was President Trump's 2016 campaign manager and has for a decade worked as a private political consultant. On February 11, 2025, he entered the Department of Homeland Security not as an officer or employee of the United States in the ordinary sense but as a special government employee, a designation limited by statute to a person retained "to perform, with or without compensation, for not to exceed one hundred and thirty days during any period of three hundred and sixty-five consecutive days, temporary duties either on a full-time or intermittent basis." 18 U.S.C. § 202(a). He drew no federal salary and no federal benefits, remained free throughout to receive outside private income, was never nominated to or confirmed for any office, and did not appear on the Department's published list of senior leaders. He is sued in his individual capacity. During his participation in Operation Metro Surge, Lewandowski acted as a private person working in concert with government actors, having exhausted his status as a special government employee well prior to the start of the operation.

41. **Defendant Todd Lyons** was the Acting Director of U.S. Immigration and Customs Enforcement during Operation Metro Surge and commanded the ICE components

that executed the stops, seizures, raids, and detentions of the operation, and to which Defendant Ross belonged. He is sued in his individual capacity.

42. **Defendant Thomas D. Homan** is the White House border czar, the senior official charged by the President with directing the administration's immigration-enforcement campaign nationally. He holds that position without Senate confirmation and outside the statutory chain of command of any enforcement agency. He served as Acting Director of U.S. Immigration and Customs Enforcement during the first Trump administration. He is sued here in his individual capacity.

43. **Defendant Gregory Bovino** was, at the time of the events at issue, Commander-at-Large of the United States Border Patrol and the field commander of Operation Metro Surge. He is sued in his individual capacity.

44. At all relevant times, Defendants Ross, Miller, Noem, Lyons, Homan, Bovino, and the John Doe Federal Agents acted under color of federal law and within the scope of a joint enterprise with the private actors described below. Defendant Lewandowski acted in part under color of federal law and in part, as alleged below, as a private person, his federal status having been limited to a temporary part-time designation that his conduct exceeded. Shirley, Rufo, and Ben Bergquam, and the other non-party private actors described below, agreed to and in fact participated in the conspiracy alleged here: each acted in concert with, and with the knowledge and encouragement of, federal officials.

45. The participants in the conspiracy were not officers or employees of any single entity: they spanned the White House, the office of the border czar, the office of the

Secretary's part-time private adviser, the Department of Homeland Security and its separate components ICE and CBP, and private persons and for-profit enterprises.

## FACTUAL ALLEGATIONS

### I. OPERATION METRO SURGE WAS CONCEIVED, ORDERED, AND CARRIED OUT TO SATISFY THE PRESIDENT'S EXPRESSED ANIMUS TOWARD PEOPLE OF SOMALI ORIGIN AND HISPANIC PEOPLE

#### A. Minnesota's Somali and Hispanic communities and the prosecutions that preceded the campaign

46. Minnesota is home to the largest Somali community in the United States; approximately 84,000 people of Somali descent in the Minneapolis–Saint Paul area alone. Nearly sixty percent of Somalis in Minnesota were born in the United States, and approximately eighty-seven percent of the foreign-born are naturalized United States citizens. More than ninety percent of Somalis in America are United States citizens and are therefore not subject to immigration enforcement at all.

47. Minnesota is also home to a large, long-established Hispanic community, concentrated in south Minneapolis along the Lake Street corridor, on the West Side and the East Side of Saint Paul, and in the suburbs south of the Minnesota River. Like the Somali community, it is overwhelmingly a community of United States citizens and lawful permanent residents.

48. Beginning in 2022, during the prior administration, federal prosecutors charged individuals in connection with fraud against pandemic-era and social-services programs, most prominently the Feeding Our Future child-nutrition scheme, in which forty-seven people were indicted in 2022. In the wake of the pandemic, there were many

such fraud prosecutions across the country. Many but not all of the Feeding Our Future defendants were of Somali descent; the alleged ringleader of Feeding Our Future is white. Those prosecutions rested on evidence of individual wrongdoing. Nothing in them implicated the Somali-American community at large, and nothing in them implicated Hispanic Minnesotans at all.

49. The conspiracy alleged in this complaint used prosecutions of individuals, and, as described above and below, specious allegations made by fringe influencers, as pretext to launch a violent and discriminatory campaign against these two groups of Minnesotans based on national origin, race, and ethnicity.

**B. The President's animus toward Hispanic people and toward people of Somali origin and descent**

50. The President's hostility to Somali Minnesotans as a group predates the operation. He targeted Somali refugees in Minnesota in each of his presidential campaigns beginning in 2016, and in 2019 posted that Representative Ilhan Omar, a naturalized citizen born in Somalia, and three of her colleagues of color should go back to the countries they came from (the other colleagues at whom this remark was directed were born in the United States).

51. The President's hostility to Hispanic immigrants as a group is older still. He opened his first presidential campaign on June 16, 2015, by describing Mexican immigrants as a criminal population: "When Mexico sends its people, they're not sending their best. . . . They're bringing drugs. They're bringing crime. They're rapists."

52. **March 14, 2025.** The President invoked the Alien Enemies Act of 1798 by proclamation against Venezuelan nationals as a class, declaring every Venezuelan citizen fourteen years of age or older who was not a United States citizen or lawful permanent resident and who was deemed to be a member of Tren de Aragua subject to summary apprehension and removal. The proclamation established the template the administration would use in Minnesota: tar an entire national-origin group as hostile by executive fiat.

53. **November 21, 2025.** In the Truth Social post terminating Somali Temporary Protected Status, issued within hours of Rufo's televised solicitation, the President asserted without evidence that Somali gangs were terrorizing Minnesota, declared billions of dollars missing, and directed, of Somalis: "Send them back to where they came from."

54. **November 27, 2025.** In a late-night Thanksgiving post (following a shooting of National Guard members in Washington, D.C., by an Afghan national with no connection to Minnesota or to Somalis), the President blamed refugees, including Somalis in Minnesota, for "social dysfunction in America," and claimed Somalis were "completely taking over" Minnesota.

55. **December 2, 2025.** Closing his televised Cabinet meeting the same day Defendant Homan announced increased ICE activity in Minnesota, the President repeatedly described Somali immigrants as "garbage," warning that the country would "go the wrong way if we keep taking in garbage into our country," and applied the same epithet to Representative Omar.

56. In the same remarks the President said of Somalis: "I don't want them in my country," "Their country is no good for a reason. Their country stinks."

57. In the same remarks the President called Somalia barely a country, accused Somali refugees of ripping off Minnesota for billions while contributing nothing, and said of Somalis: "When they come from hell, they complain . . . ," telling them to go back and fix their own country.

58. **December 3, 2025.** On the first day of the administration's purported immigration crackdown in the Minneapolis–Saint Paul area, the President declared from the Oval Office that Minnesota is "a hellhole right now. The Somalians should be out of here," that Somalis have "destroyed our country" and do nothing but complain, and that Somalia is not even a nation but people walking around killing each other.

59. In the same remarks the President said, "What the Somalian people have done to Minnesota is not even believable," called Minneapolis Mayor Jacob Frey a fool for expressing pride in the city's Somali community, and declared that Representative Omar should be "thrown the hell out of our country," a demand for the expulsion of a United States citizen and elected U.S. representative on the basis of her Somali origin.

60. The President's animus continued after the operation ended: at a May 2026 Cabinet meeting he declared of Somalis, "they're all crooks," said the Somalians had destroyed the country, and reiterated that Representative Omar should be expelled.

**C. The President's immediate response to false, animus-driven accusations targeting Minnesota's Somali community**

61. On November 19, 2025, Rufo and Thorpe published in *City Journal* a report titled *The Largest Funder of Al-Shabaab Is the Minnesota Taxpayer*, asserting that fraud in Minnesota's public programs was perpetrated in many cases by members of the Somali

community and that millions of dollars in stolen funds had reached the terrorist organization al-Shabaab.

62. The terror-financing claim rested on a single named source, retired Seattle detective Glenn Kerns; otherwise it purported to rely on other law enforcement sources that were unnamed. Kerns later told the Star Tribune that the story was "bullshit," that he was misquoted, that he never traveled to Minnesota to investigate the connection as the piece claimed, and that "[t]hey went way too far on their poetic license to make it into a big story." Kerns also said: "I was pointing him in the right direction to start digging. That was all." Thorpe acknowledged that Kerns's original statement was that he went down to the state, and that his editor changed it to say that he went down to Minnesota. Kerns complained to *City Journal* soon after publication and received no response.

63. This is not the first time Rufo has targeted a specific immigrant community—in September 2024 he offered a $5,000 reward for proof that Haitian migrants in Ohio were eating household pets, after local police said there was no evidence of it.

64. Within hours of publication, Rufo launched a series of posts on X directed at the President, writing that "Somalis are stealing billions of dollars from American taxpayers and sending cash to terrorists back home," and publicly calling on the President to revoke Temporary Protected Status for all Somali nationals in the United States, a demand for adverse federal action against an entire national-origin group. He concluded: "It's time for them to go home."

65. Rufo was motivated by discriminatory animus against people of Somali descent and origin. He ascribed the fraud to Somali culture, describing what happens "when

a tribal mindset meets a bleeding-heart bureaucracy" and "when imported clan loyalties collide with a political class to timid to offend." Rufo wrote openly that "the fact that Somalis are black is incidental" because "Somalis in Minnesota behave similarly to Somalis in Somalia," and that "different groups have different cultural characteristics. The national culture of Somalia is different from the national culture of Norway," concluding that "[a] rational government would amend its policies accordingly." He also wrote that "the Somali criminal enterprise is incompatible with a generous welfare state." He was also quoted as writing that "Jews excel in science, business, academia, arts, and entertainment . . . while Somalis excel in welfare fraud."

66. After his X post, Rufo then made the same demand to end TPS for Somalis to the President on national television, and published his account of the result: "It filtered upward to primetime Fox News, where, on Laura Ingraham's program, I summarized the piece and called on President Trump to revoke Temporary Protected Status (TPS) for all Somalis in Minnesota. Within hours, the president, who had been following the story, announced that he would revoke TPS for all Somali recipients." In a separate essay he wrote: "The story quickly reached the White House. Within days, President Trump announced that he was revoking the Temporary Protected Status (TPS) for all Somali migrants in Minnesota."

67. On the night of Friday, November 21, 2025, the President posted on Truth Social that he was terminating, effective immediately, the Temporary Protected Status program for Somalis in Minnesota, asserting without evidence that Somali gangs were

terrorizing the state and that billions of dollars were missing, and directing, of Somalis: "Send them back to where they came from."

68. The sequence is cause and effect. Rufo's object was to reach one man, President Trump, rather than to inform the public, because the President's word was sufficient to move the federal government against an entire national-origin group against whom they both harbored animus.

69. Following Rufo and Thorpe's article, the President made a series of statements, and his administration took a series of actions, evincing animus toward and targeting people of Somali descent and origin. In addition to the November termination of TPS, on December 2, 2025, he called Somali immigrants "garbage," said "I don't want them in my country," and said their "country stinks"; that same day Defendant Homan announced that enforcement activity in Minnesota would increase and that the administration would enforce the immigration laws "without apology," including in the Twin Cities. This marked the beginning of Operation Metro Surge.

70. On December 3, 2025, the President declared that Minnesota was "a hellhole right now" and that "[t]he Somalians should be out of here"; that was very shortly after the start of street-level enforcement in the Twin Cities. In the weeks that followed, the succession of ethnically defined agency investigations, the freezing of an entire State's childcare funding, and the deployment of approximately 2,100 additional agents each followed the President's public animus toward the Somali community.

71. As discussed above and below, the operation's stated predicates cannot account for that sequence of events. What changed in November and December 2025 was

not any evidence of fraud of terror-funding; what changed was that the President, in concert with private actors, had begun to speak publicly, and repeatedly, about Somalis, in terms unmistakably evincing animus.

**D. The President directs the federal enforcement apparatus, and it acts on his word**

72. The Department of Homeland Security is an executive department whose Secretary is appointed by the President, serves at his pleasure, and exercises only the authority the President permits her to exercise. 6 U.S.C. § 112. Immigration and Customs Enforcement and Customs and Border Protection are components of that Department, and the officers who carried out Operation Metro Surge were removable at will by superiors who were themselves removable at will by the President. No independent agency stands between the President's stated wishes and the conduct of a Deportation Officer on Portland Avenue. When the President said publicly and repeatedly that a named ethnic community should be targeted and removed from a state, the officials who command the nation's immigration enforcement apparatus understood the statement as an instruction, and they acted on it.

73. The administration confirmed that understanding in its own official publications. On January 2, 2026, the White House announced what "the Trump Administration Is Doing to Crush Minnesota's Fraud Epidemic," describing a campaign directed at "the Somali-dominated scams that have bled taxpayers dry." On January 5, 2026, two days before Jonathan Ross killed Renee Good, the White House posted that the President and his administration were unleashing a relentless assault on Minnesota. And on February 4, 2026, the White House credited the operation's arrest totals to the President

personally, counting those made "since President Donald J. Trump launched Operation Metro Surge."

74. The President's animus became a street-level operation via Defendant Miller, who converted the President's desire to terrorize Minnesota's Somali community into operational orders. Miller holds simultaneous appointments as White House Deputy Chief of Staff for Policy and as Homeland Security Advisor, and he used them to run the immigration-enforcement agencies directly: he convened the daily conference calls on which deployments were ordered, set the arrest quotas that produced the roving-patrol method, defined the object of federal investigation in ethnic terms in public, and told the participants on those calls that those resisting the operation needed to be vanquished by any force necessary. He has acknowledged that the White House issued protocols governing which federal personnel performed which functions in Minneapolis and that the White House evaluated compliance with them. His role, his statements, and his orders are pleaded in detail below.

75. An operation conceived to satisfy the President's expressed animus required personnel who would carry it out. Defendants Noem and Lewandowski fired or demoted approximately eighty percent of the career field leadership of Immigration and Customs Enforcement, the agency whose officers conducted Operation Metro Surge and to which Defendant Ross belonged. The Commissioner of Customs and Border Protection was forced out after conflicts with them over their elevation of Defendant Bovino, the Border Patrol official who commanded the operations in Chicago and Minneapolis. A senior ICE attorney who declined to sign off was placed on administrative leave, then demoted and

transferred. Within the Department of Justice, prosecutors and agents who sought to investigate Renee's killing were directed to stop; a number resigned. The officials who remained were the officials willing to execute the discriminatory campaign the President had called for.

76. It is thus unsurprising that, as pleaded in greater detail below, a federal court found, after a full evidentiary hearing, that during Operation Metro Surge, DHS "adopted a policy authorizing federal immigration officers to conduct investigatory stops based on ethnicity or race without reasonable suspicion," and that officers "stopped Somali and Hispanic individuals without reasonable suspicion while they did not stop similarly situated nearby white individuals."[2]

77. The President's statements are not mere background. They are evidence of the purpose for which Operation Metro Surge was created, and that purpose is imputed to every person who joined the enterprise and carried it out. A subordinate who executes an assignment framed by his superiors in ethnic terms acts for the purpose that framed the assignment, whether or not he ever voices an ethnic slur himself. Defendant Ross was deployed to Minnesota by an operation motivated by the President's publicly expressed animus; he conducted himself in the manner the operation required; and the injuries he inflicted were inflicted in the service of the operation's object.

78. The President's public statements concerning people of Somali origin were understood by each of the federal Defendants as a direction to act against that community;

[2] Findings of Fact, Conclusions of Law, and Order, *Hussen v. Noem*, No. 0:26-cv-00324-ECT-ECW (D. Minn. Mar. 9, 2026) (Tostrud, J.).

the operation they designed, commanded, and executed was designed, commanded, and executed to satisfy that direction; and no participant in the operation could have failed to understand whom it was aimed at or why, because the President had said so repeatedly, in public, and on the record.

## II. THE AGREEMENT BETWEEN THE FEDERAL DEFENDANTS AND THE PRIVATE CO-CONSPIRATORS

### A. The pre-existing federal–private media apparatus

79. By 2025, the administration had established a practice, essential to the conspiracy alleged here, of granting sympathetic right-wing content creators embedded access to immigration enforcement operations, ride-alongs, interviews with detainees in the back seats of federal vehicles, and access to secure facilities, while denying comparable access to other media and threatening bystanders who recorded the same operations.

80. According to internal ICE communications, ICE's public affairs team saw benefit in granting right-wing media figures exclusive access in exchange for positive coverage. During Operation Metro Surge and other immigration enforcement operations, DHS sought to flood the airwaves with content showing immigrants being chased, grabbed, and detained, and DHS invited right-wing influencers and war-zone videographers to ride along with law enforcement agents and record field operations. A former DHS press secretary described the new approach as veering into propaganda and into creating fear; indeed, the White House sought to portray areas targeted by immigration enforcement as war-torn.

81. The arrangement was discussed on the record by a sitting ICE official. On October 28, 2025, Bret Bradford, the Director of ICE's Houston Field Office, appeared jointly with Ben Bergquam on Steve Bannon's War Room. Bergquam is a far-right online influencer who works for media outlet Real America's Voice and hosts a program called *Law and Border* in which he repeatedly rides along with federal immigration agents. Bradford explained the purpose of the access: "All these activist groups throw out all kinds of misinformation out there to try and get people on their side. It's not true. And that's why it's important to do these interviews and have people like Ben out here tell our story. . . . We gotta counter that narrative."

82. In the same broadcast, Bergquam described his own operational relationship with the agency and his advance knowledge of nonpublic operations: "Well, I'm gonna be in and around the Texas area covering ice and working with ice. Can't talk about everything we're gonna be doing, but some major operations happening across the country." The same broadcast included an ICE public information officer briefing Bergquam on the tactical posture of an active scene.

83. Bergquam has claimed to embed with ICE almost every week since January 2025. He has broadcast footage alongside ICE officers, embedding with them in Chicago, Indianapolis, Los Angeles, San Antonio, Baltimore, Miami, Phoenix, Harlingen, Maryland, Portland, and Minneapolis; he once accompanied Defendant Homan on an immigration raid; and he was permitted aboard a federal aircraft holding deportees in Gary, Indiana, where he filmed the faces of handcuffed migrants. That relationship is by design. He wears an ICE baseball cap on ride-alongs and edits his footage to blur agents' faces

while keeping detainees' faces in focus. The agency has publicly promoted his work: in September 2025 ICE's X account shared his forthcoming episode, and he answered, "Does it get any better than being shared by #ICE?! Honored!"

84. Defendant Homan's relationship with the private actors embedded in this apparatus predates the second administration. In a 2022 episode of his program *Law and Border*, Bergquam interviewed Defendant Homan, who advanced a version of the Great Replacement conspiracy theory, insisting that Democratic support for immigrants is part of a scheme to win elections: "More of them [are] counted in the census, in sanctuary cities, which results in more seats in the House for the Democrats. . . . It's all about perpetual power." Bergquam has since accompanied Defendant Homan personally on immigration raids, including in Chicago in January 2025. It was as Defendant Homan assumed the role of border czar in the second administration that Bergquam became a frequent companion of ICE during the agency's intensifying immigration raids. The practice of embedding allied private content creators in federal immigration enforcement operations (the practice that placed Bergquam in a federal vehicle during the race-based street stop of a Somali-American United States citizen in Minneapolis on December 10, 2025, and at other points during the course of Operation Metro Surge, as discussed below) was known to, and sanctioned by, Defendant Homan.

85. On or about October 7, 2025, Defendant Noem personally embedded content creators (including Nick Sortor and Benny Johnson) to accompany her during ICE operations in Portland, Oregon, appearing with them on the roof of the Portland ICE facility while local journalists were denied access to the same facility and held behind a police line

outside. The influencers were transported from the airport to the facility in her motorcade. Sortor posted video of Defendant Noem confronting a detainee in the back of a law-enforcement vehicle.

86. When Portland police arrested Sortor days later, the federal response was immediate: the Attorney General telephoned him to say federal prosecutors would examine his arrest; an Assistant Attorney General announced that the Department of Justice would investigate the Portland Police Department for viewpoint discrimination; the charges were dropped; and the President reportedly telephoned him within hours of his release. An ICE protestor involved in the encounter with Sortor still faced charges.

87. In October 2025 the White House convened a Roundtable on "Antifa" in the State Dining Room, attended by content creators including Shirley and Sortor. Shirley spoke directly to the President and later described the event as an "opportunity to brief President Trump about some of my reporting over the past year or so." Sortor's invitation came one day after he was granted special access to DHS operations in Portland.

88. Shirley's influence over federal enforcement operations pre-dated Metro Surge. In September 2025, Shirley published a video accusing street vendors on Manhattan's Canal Street, many of them African immigrants, of being scammers. One month later ICE staged a large raid on Canal Street and detained, among others, Mamadou Ndoye, the vendor whom Shirley's video showed confronting him. In a declaration filed in a habeas proceeding, Ndoye stated that during a subsequent ICE check-in an officer asked him why he had been so aggressive toward Shirley in the video. When agents took him again on February 12, 2026, they told him that he "was being mean to Nick" and that he

should not have reacted to Shirley that day. Shirley publicly praised the raid and taunted a detainee as a scammer who got "ICED."

89. In mid-October 2025, during the federal surge into Chicago commanded by Defendant Bovino, Shirley was granted a ride-along with ICE agents, interviewed a detainee in the back seat of an ICE vehicle (while local journalists were denied access to the same operations), and published the resulting video under the title *Nick Shirley Deports Migrants with ICE*.

90. Defendant Bovino personally amplified this private-actor network. He retweeted a Bergquam ICE ride-along video, adding his own commentary: "Yep . . . 100 million. Change my mind. . . . Mass deportations aren't extreme, they're basic survival." Bergquam retweeted him back.

**B. Federal-private partnership during Operation Metro Surge**

91. Federal coordination with private far-right influencers operated in part through a reciprocal exchange: private actors generated ethnically framed accusations and spectacle; federal officials converted those accusations into enforcement operations against the accused class; and federal officials then rewarded the private actors with exclusive operational access, public praise, official protection, and proposed congressional honors, access and rewards that generated the private actors' income and audience, and further content for the next cycle of enforcement. The playbook was on full display during Operation Metro Surge.

**1. Shirley's participation in Operation Metro Surge**

92. Nick Shirley is a far-right social media influencer with no background in journalism. Shirley began posting prank videos in 2019 and filmed himself in the crowd outside the United States Capitol on January 6, 2021, where he interviewed Alex Jones and rioter Richard Barnett.

93. Shirley's content before Minnesota followed a consistent pattern of targeting immigrant communities of color. In 2024 he produced a video about the Haitian community in Springfield, Ohio titled *Are the Rumors True?*, and filmed in Aurora, Colorado during the Tren de Aragua panic about Venezuelan migrants. In May 2024 he paid Hispanic day laborers twenty dollars each to hold signs in front of the White House. His most-viewed video celebrated El Salvador's CECOT prison from inside a cell block without mentioning the torture that regularly occurred there.

94. Shirley's role in Operation Metro Surge was to manufacture the animus-driven false accusation that the federal participants used to justify sharply escalating the operation. On December 26, 2025, three-to-four weeks into Operation Metro Surge, and in the wake of the President's repeated statements targeting Minnesota's Somali community, Shirley posted a forty-two-minute video titled *I Investigated Minnesota's Billion Dollar Fraud Scandal*, claiming that approximately ten Somali-run day care centers in Minneapolis had misappropriated upwards of $100 million in public funds. His caption read: "We uncovered over $110,000,000 in ONE day."

95. The video's methodology consisted principally of knocking on doors at midday and drawing sweeping inferences from locked doors, blacked-out windows,

unanswered phones, the absence of visible children, and the absence of footprints in the snow—circumstances equally consistent with ordinary childcare security practices, with Minnesota's cold winter season, and, in at least one instance, with the facility being closed that day. In his congressional testimony Shirley described his evidence in exactly those terms: "no children footprints in the snow," windows blacked out, no playground.

96. Shirley posed as a parent looking for childcare for a fictitious son, Joey, and approached individuals with dark skin and women wearing hijabs, questioning them insistently. Police were called on him twice; a woman told a responding officer, "He's trying to assume because they're Somalian providers everyone here is fraudulent — he's here with some kind of propaganda." Police escorted him out of a health care complex.

97. Video footage taken by local Minneapolis residents showed that Shirley and a man named David Hoch arrived with masked men, frightening at least one day care director into not opening the door.

98. Asked how he knew his allegations were true, Shirley answered: "Well, we showed you guys what was happening, and then you guys can go ahead and make your own analysis."

99. In reality, Shirley was handed his list of purportedly fraudulent childcare facilities by a lobbyist who has repeatedly posted content denigrating Minnesota's Somali community. By his own account to Congress, Shirley "became aware of the fraud occurring in the state of Minnesota in June." He then stated: "A few months later a man by the name of David messaged me saying that he had been investigating fraud in Minnesota on his own for years. He had the information. I then went to Minnesota to meet him. On

December 16 we meet to go do our investigation. We had the locations, their enrollment numbers and the amount received in CCap funding for 2025."

100. "David" is David Hoch of Fridley, Minnesota. He is a registered Minnesota lobbyist, the president and co-founder of Minnesotans for Responsible Government, and a former fringe candidate for Governor in 2006 and Attorney General in 2010. In Shirley's video, Hoch says: "I have some contacts in the Capitol going back many, many years and so the data I am getting is 100 percent accurate coming directly from research done by people at the state capitol."

101. Hoch had written on a since-deleted Instagram account that "EVERY Somali in MN is engaged in fraud. ALL of them," and, in November 2025, that "[e]ven the Blacks have had enough of the demon Muslims." Hoch's TikTok and Instagram accounts posted almost exclusively about Minnesota's Somali community, including derogatory statements about Somalis and Muslims, and one post displayed the same printed list of Somali-owned day cares that Hoch holds in Shirley's video. Shirley nonetheless presented him to a national audience as an investigator and withheld his full identity.

102. Shirley's video was refuted within days, by the State of Minnesota and by the press:

a. Minnesota's Commissioner of Children, Youth and Families, Tikki Brown, stated publicly that all ten featured facilities had been inspected within the prior six months as part of standard licensing checks, that "[t]here have been ongoing investigations with several of those centers," and that "[n]one of those investigations have uncovered findings of fraud." She publicly questioned whether Shirley's footage had even been shot during

operating hours, asking: “When were the videos taken? Were they during times that the center was scheduled to be open? Were they during the weekend?”

b. CBS News conducted its own review of nearly a dozen day care centers mentioned by Shirley and found that all but two of the featured centers held active licenses, that all active locations had been visited by state regulators within the previous six months (one as recently as December 4, 2025), and that although the records contained citations for safety, cleanliness, equipment, and staff training, there was no recorded evidence of fraud.

c. State inspectors visited nine of the day cares from the video and found children present at eight of them; the ninth had not yet opened for the day when inspectors arrived.

d. The Star Tribune was allowed inside four of the ten facilities Shirley visited, days later, and found children napping and playing.

e. CBS Minnesota reviewed timestamped footage showing children being dropped off at a center Shirley claimed was always empty, both before and after his visit; a CNN crew interviewing Shirley filmed caregivers dropping off children in the background, which Shirley dismissed as “showing face.”

f. On Friday, January 2, 2026, the Department of Children, Youth and Families announced that the day cares at the center of the allegations had been found to be operating as expected when recently inspected by the State.

103. On Monday, December 29, 2025, three days after Shirley’s video posted, Defendant Noem announced that federal agents were carrying out a massive investigation

into childcare and other rampant fraud in Minneapolis. The Department's official account followed with a post stating that its investigators were on the ground in Minneapolis going door to door at suspected fraud sites, that the American people deserved answers on how their taxpayer money was being used, and that arrests would follow when abuse was found.

104. Having previously embedded with and coordinated with the administration's immigration enforcement apparatus, and having awareness of the President's repeated statements evincing animus toward people of Somali descent and of the ongoing targeting of Somalis in Minnesota by DHS, Shirley acted with knowledge and purpose that federal officials would take further aggressive against people of Somali origin as a class on the strength of his accusation, and he acted with the purpose that they do so.

105. Vice President JD Vance amplified the video to millions the day after it posted, writing that "[t]his dude has done far more useful journalism than any of the winners of the 2024 @pulitzercenter prizes." Elon Musk, who previously headed the administration's Department of Government Efficiency, amplified it, writing: "You are the media now." Then-Attorney General Pam Bondi lauded it; the President amplified it; and Donald Trump Jr. hosted Shirley on his podcast.

106. In late December 2025 the Department of Health and Human Services froze all federal childcare funding for the State of Minnesota (approximately $185 million per year) amid the video-driven furor. Shirley subsequently claimed credit for that freeze before Congress: "Since my reporting the HHS department froze $185 million in childcare . . . ."

107. On January 2, 2026, the White House published an official release titled *Here's What the Trump Administration Is Doing to Crush Minnesota's Fraud Epidemic*, stating that the administration's campaign was "fueled by shocking video from Nick Shirley and tenacious reporting by Alpha News exposing the Somali-dominated scams that have bled taxpayers dry." The post hyperlinked directly to Shirley's video.

108. The same release tallied the government's own criminal defendants by ethnicity (ninety-eight defendants charged in Minnesota fraud-related cases, eighty-five of them of Somali descent) and expressly adopted Shirley's targets, stating that many of the facilities and schemes visited in his viral video were under active investigation by the Department of Justice. It announced that DHS was on the ground conducting door-to-door investigations of suspected fraud sites in Minnesota, and that DHS was determining which cases required additional vetting, including for refugee status and potential denaturalization.

109. Beginning Sunday, January 4, 2026, DHS deployed approximately 2,100 additional personnel to Minnesota (1,500 enforcement and removal officers and 600 Homeland Security Investigations agents) in one of the largest concentrations of DHS personnel in any American city. On January 5, 2026, the White House posted that the President and his administration were unleashing a relentless assault on Minnesota, and Defendant Noem participated in a videotaped immigration raid in Saint Paul. On January 6, 2026, DHS posted a message reading *GOOD MORNING MINNEAPOLIS!*, reposted by the official accounts of the White House, ICE, and USCIS, and amplified a clip of

Defendant Lyons declaring, “We have the largest immigration operation ever taking place right now.”

110. DHS told NBC News that the additional agents would focus on investigating fraud at day care centers and other businesses in the wake of Shirley’s viral video. The single largest escalation of the operation was thus publicly and officially tied to a private conspirator’s content that the government already knew or had substantial reason to know to be false.

111. On January 8, 2026, a second White House document, announcing a new Justice Department fraud division, stated that “[m]any of the facilities and schemes visited in Nick Shirley’s viral video are currently under active investigation by the DOJ.” In May 2026 the White House credited itself with having charged “a Minneapolis daycare owner featured in Nick Shirley’s viral video.” No comparable government document credits any career investigator.

112. Shirley immediately monetized the campaign. His following on X grew from roughly 200,000 in early December 2025 to more than 800,000 by December 29, 2025, and his YouTube channel grew from 1.21 million subscribers on December 30, 2025, to 1.65 million by February 3, 2026. The December 26, 2025 video accumulated more than 140 million views on X. He solicited donations, sold merchandise including a shirt labeled The Battle of Minneapolis and sweatshirts priced upwards of fifty dollars, and sold subscriptions through a website called Anti Fraud Club, which advertises more than 55,000 readers and a paywalled members’ area. He told the New York Times: “I hit a new level

of fame. Now everywhere I go, I get recognized." When Governor Walz announced he would not seek reelection, Shirley posted on X: "I ENDED TIM WALZ."

113. Shirley claimed the same credit in testimony before a committee of Congress: "My video received over 100 million views and created instant change within the government." Testifying before the Senate Committee on Homeland Security and Governmental Affairs on July 15, 2026, he described his Minnesota video as the "most consequential in American history by the amount of legislation it created."

114. In November 2025 he received the inaugural Citizen Journalist of the Year award at a gala held at the Mar-a-Lago Club, selected by a panel that included Steve Bannon. On February 24, 2026, he attended the State of the Union Address as the guest of a Member of Congress, who announced the invitation in an official press release stating that Shirley and David Hoch had done Minnesota "a tremendous service" and "did more work and showed more transparency than the Minnesota Department of Human Services." In July 2026 the Administrator of the Centers for Medicare and Medicaid Services personally accompanied him through New York City, confronting business operators on camera for his channel.

115. A Member of Congress, administration ally Eli Crane, introduced legislation to award Shirley the Congressional Gold Medal within eleven days of the video, and the bill's findings adopt the conspiracy's ethnic framing as a legislative finding of the United States. House Resolution 6942, introduced January 6, 2026, finds that Shirley released content exposing "mass fraud in the Minnesota Somali population against U.S. taxpayers." A near-identical successor bill introduced the following day describes a "42-minute

investigative video" on December 26, 2025, detailing "mass fraud in the Minnesota Somali population." The sponsor's announcement praised Shirley as "a fearless citizen journalist who stood up to a corrupt system."

116. Shirley's participation in Operation Metro Surge was driven by animus toward people of Somali descent and origin. In an interview with the journalist Andrew Callaghan, explaining how to build an audience, he instructed: "Don't be afraid to say what are Somalians known for, when you know the answer inside your head." Asked to defend the invitation to stereotype, he answered: "How do you gain more trust? Well, don't be afraid to say a fact or an opinion."

117. In July 2025, five months before Operation Metro Surge, Shirley published a video within a series on what he called the rise of Islam and "Minnesota's Somali Takeover," which made a spectacle of the Muslim call to prayer and of individuals at prayer and singled out Representative Ilhan Omar. His catalog includes videos titled Exposing Dangerous Illegal Migrant Scammers and The UK's Insane Migrant Invasion. In an interview with the British anti-Islam activist Tommy Robinson in October 2025 he repeated the false claim that 40,000 British Muslims appear on the United Kingdom's terror watchlist and asked, "At what point does this break out from a revolution to a civil war?"

**2. Bergquam's participation in Operation Metro Surge**

118. As he did in numerous other cities in which ICE was conducting enforcement operations, Bergquam embedded with ICE in Minnesota during Operation Metro Surge for the purpose of serving as the propaganda arm of DHS's campaign.

119. On the morning of Wednesday, December 10, 2025, at approximately 8:00 a.m., at 515 15th Avenue South in Minneapolis, Mahamed Rufai Eydarus, a twenty-five-year-old United States citizen born in Atlanta, and his mother, a naturalized United States citizen, were shoveling out his parking space on the street when at least three unmarked vehicles pulled up and, in his sworn words, "I saw several men walked towards me and my mother very quietly, as if they were trying to surround us without us knowing."

120. The men surrounded them and, as Eydarus swore, "did not identify themselves in any way or tell us who they were." Their clothing, he said, "was not uniform. Everyone was wearing different colored vests, many were wearing masks, and no one ever identified themselves or showed any badges." They were armed with guns, tasers, and pepper spray. The first thing they said to him was that they needed to see his identification to make sure he was "not illegal." An agent asked him, "Why are you speaking that foreign language?" Agents told his mother to remove her niqab, a religious face covering.

121. Two of the men who got out of those unmarked federal vehicles were not wearing masks. As Eydarus swore: "These two men had cameras and recording devices attached to their phones and appeared to be livestreaming. The livestreamers came right up next to me and were in my face, and seemed to be helping the ICE agents block me in. I asked them who they were, but they would not answer me. Instead, they were laughing and smirking and calling my mother and me 'illegal aliens,' despite us both being U.S. citizens."

122. Eydarus later learned from community members that one of the unmasked livestreamers riding in the federal vehicle was Bergquam. Bergquam released a ride-along

video that same day, filmed at the same intersection. Nobody in the video is identified as an undocumented immigrant; instead, Bergquam focuses on United States citizens whom he calls "the enemies within."

123. Eydarus swore: "I heard the federal agents say that people recording from the street had to stand back or they would be arrested. However, the ICE agents did not ever tell Mr. Bergquam or the other livestreamer to back off, stop filming, or move away."

124. A federal judge later found, after an evidentiary hearing, that Eydarus and his mother "were stopped and detained based solely on their race or ethnicity."

125. Bergquam filmed conduct at that stop that he then declined to publish. Although agents demanded that Mr. Eydarus's mother remove her niqab, no such interaction was found in the videos Bergquam posted online. The private actors embedded in Operation Metro Surge, including Bergquam, functioned as a publicity arm of the operation rather than as journalists, publishing what served its publicity goals and suppressing what did not.

126. From the back of an ICE vehicle during Operation Metro Surge, during a live news report, Bergquam described the target of ICE's activities as "the worst of the worst in these communities, the Somalis and the rest of them." On the same broadcast, he referred to "fraud Somali illegals" and "Somali fraud." And he said: "[I]t is not surprise at all that you have all these people committing fraud that were brought in from third world countries that operate on fraud. . . . why would you expect them to operate any differently?"

127. In another *Law and Border* report from Bergquam's embedding in Operation Metro Surge, Bergquam specifically targeted individuals who alerted community members

to ICE's presence. From the back of an ICE vehicle, Bergquam stated: "You've already got activists, this guy riding around on his bike, he's tracking our group. Going to be calling out to his friends, telling his friends where we are, so they can come and try to dox us." From the street during his embedding, Bergquam furthered: "These activists, right here, that are aiding and abetting illegal aliens that are working with NGOs in America. Many of the times the same NGOs that invited the invasion into our country. Blowing whistles out here to get attention, and then calling, putting it out on social media where ICE is in the community. These are the enemies within." The voiceover during the segment stated: "It was this kind of behavior that led to Renee Good and Alex Pretti ending their life."

128. Bergquam acted in the operation as a participant rather than as a journalist covering it. He wears an ICE or Trump hat on ride-alongs; he blurs agents' faces while keeping detainees' faces in focus; and a sitting ICE Field Office Director explained on the air that the access exists because "it's important to do these interviews and have people like Ben out here tell our story. . . . We gotta counter that narrative."

129. Bergquam functioned precisely as the propagandist ICE intended: during Operation Metro Surge, Bergquam—using his unfettered access—published what served the operation and suppressed what did not, and he publicly celebrated the killings of U.S. citizens that occurred during the operations. Speaking from Minneapolis, he said of those protesting ICE: "They want to kill us . . . . This is demonic manifestation in real life. They are so demon possessed. Many of these people wanted to be Renee Good. They wanted to be Alex Pretti because they are willing to die to destroy this country." A week after federal

agents killed Alex Pretti without justification, he said on a podcast that Pretti was "rightfully killed by ICE."

130. The transport of private propagandists in federal enforcement vehicles during race-based stops of Somali-American and Hispanic citizens was authorized at the command level of Operation Metro Surge, that is, by Defendants Homan, Bovino, Lyons, and/or Noem, or their designees. Bergquam and his collaborator Josh Fulfer embedded with ICE in cities across the country during the same period, confirming that the embedding of these particular private actors was a recurring, sanctioned practice rather than an isolated event. The factual basis for the allegation of command-level authorization includes the recurrence of the practice across multiple cities and months; ICE Field Office Director Bradford's on-air explanation of the access; the internal ICE communications described above; and Defendants Noem and Homan's own personal embedding of content creators in operations.

131. Bergquam repeatedly received unprecedented access to ICE operations. He was provided access to film unmasked at close range during operations at which bystanders were chased away. In the Minneapolis encounter in which Mahamed Eydarus was seized, agents ordered other bystanders to back away and made no such request of Bergquam and the second unmasked man filming beside him. During Operation Metro Surge, journalists in Minnesota were injured by agents, arrested, and threatened, and three journalists were charged federally in connection with a protest inside a Saint Paul church. The privilege Bergquam enjoyed and the exposure and injury everyone else faced were parts of a single

policy designed to ensure that the operation would be covered by propagandists willing to do the Administration's bidding.

132. Bergquam's participation in Operation Metro Surge was likewise motivated by discriminatory animus. In addition to the foregoing statements that Bergquam made regarding people of Somali descent, Bergquam has published that "Satan created Islam," that Islam is "not compatible with America or Europe," that "England is dead unless you drive the Muslims out," and repeated calls for a second Crusade. Asked about these posts, he described them as among his "greatest" social media posts. Of the Proud Boys, Bergquam has said: "I thank God for them."

## III. OPERATION METRO SURGE IN PRACTICE: MASKED AGENTS ROVING PUBLIC STREETS AND TARGETING PEOPLE OF SOMALI DESCENT AND ORIGIN AND HISPANIC INDIVIDUALS WITHOUT REGARD TO IMMIGRATION STATUS

### A. The scale and character of the deployment

133. Operation Metro Surge was launched in early December 2025, and on February 12, 2026, Defendant Homan announced that it would wind down. Over its course, DHS deployed between 3,000 and 4,000 federal agents to the Twin Cities, approximately 3,000 additional ICE officers against a normal complement of 190 for Minnesota and four other states, plus hundreds of additional CBP personnel. The federal deployment exceeded the combined police departments of Minneapolis and Saint Paul.

134. The operation was in essence the domestic deployment of a paramilitary force of three to four thousand masked, armed, camouflaged agents, outfitted in military tactical gear including camouflage, helmets, gas masks, and military-grade weapons,

wielding instruments of war to carry out domestic shock-and-awe tactics to intimidate the populace.

135. The operation's participants understood fraud investigation to be a pretext. Fraud allegations are primarily investigated by reviewing documents and interviewing witnesses, not by roving groups of DHS agents dressed in riot gear and military fatigues. DHS agents in fact conducted general sweeps wherever they happened to go, detaining people in their path based on their race and ethnicity. Of the six individuals DHS publicly profiled as "the worst of the worst" formally arrested for immigration violations in Minneapolis on January 13, 2026, none was Somali.

136. At some time between January 2025 and March 2025, DHS leadership rescinded prior guidance regarding agent identification, and thereafter the practice of DHS agents wearing face-covering masks and forgoing other forms of individualized identification became standard. The former Acting Director of ICE, John Sandweg, has stated that he never saw anyone wearing masks during his tenure and that he believes the practice began in March 2025.

137. DHS adopted, authorized, implemented, ratified, and maintained a policy and practice under which federal immigration and other federal law-enforcement agents operating in Minnesota could conceal their identities with masks and similar face coverings while carrying out enforcement actions in public, a policy that violated state masking laws and encouraged armed federal agents to disregard them.

138. The United States has admitted the policy in litigation. In *United States v. California*, No. 2:25-cv-10999 (C.D. Cal.), the United States sued to enjoin California's

masking law and stated in its complaint that the federal government did not intend to comply with the challenged masking law. DHS declarant Sergio Albarran swore that "[t]he inability to conceal officers' identities during enforcement actions thus compromises DHS's mission." Border Patrol declarant Michael Vargas swore that "USBP leadership has authorized its personnel, when wearing Class C uniforms and plain-clothes undercover uniforms, to wear facial coverings, which may include eye protection, facial masks, or a combination of both."

139. Defendants Noem, Lyons, and Homan publicly defended the practice. On June 8, 2025, Defendant Noem said agents need masks for their "safety" and to "protect[] their identity." On July 20, 2025, Defendant Lyons said ICE permits masks so agents can "keep themselves and their family safe." On February 15, 2026, Defendant Homan said agents must wear masks because of unique "threats" against ICE. On March 23, 2026, the President posted: "I am a BIG proponent of ICE wearing masks as they search for, and are forced to deal with, hardened criminals . . . ."

140. No other law enforcement entity, federal or state, civil or criminal, uses masks or similar face coverings in the broad manner DHS agents do to conceal their identities during enforcement actions.

141. Minnesota law makes it a crime, with certain exceptions, for any person to conceal his or her identity in a public place by means of a robe, mask, or other disguise. Minn. Stat. § 609.735. The statute is a generally applicable criminal prohibition that contains no exemption for law enforcement agents or officers, whether state, local, or federal, and it reflects the Legislature's considered judgment that public safety is promoted

when individuals acting in public spaces are identifiable. Defendants intentionally violated it or instructed agents to violate it, and wearing a mask in violation of Minnesota law is neither necessary nor proper to the discharge of their agents' duties.

142. The concealment extended to vehicles. DHS adopted a policy allowing immigration agents to conceal, remove, or swap legally required license plates when engaged in enforcement activities in Minnesota. An observer watched ICE agents outside the Whipple Federal Building changing license plates on their vehicles; identical plates were used on separate vehicles; agents were observed driving a Jeep Cherokee bearing plates registered to a Porsche 911, a Chevrolet Tahoe with no plates at all, a Jeep bearing plates registered to a Ferrari with tabs expired since 2019, and a Dodge Durango with no rear plate; and agents obscured plates with mud or snow. In December 2025, Minnesota's Driver and Vehicle Services division wrote to DHS explaining that the practice was illegal and would not be tolerated. DHS continued it, and no DHS employee has been disciplined for it.

143. A Star Tribune review of more than one hundred Minnesota license plates attached to immigration enforcement vehicles found that nearly sixty percent were not registered with the State of Minnesota, including the Chevrolet Tahoe in which Defendant Ross traveled the day he fatally shot Renee in south Minneapolis. Another eleven percent bore some irregularity, including plates registered to nonexistent businesses; a quarter of the vehicles were rentals.

144. The purpose and effect of the masking and plate-concealment policies was impunity, and the corresponding intimidation of the public. Obscuring, removing, or

swapping license plates allowed Defendants' agents to avoid accountability for abuses and created dangerous situations in which residents could not tell the difference between immigration officers engaged in enforcement activities and civilians posing as immigration officers to engage in criminal activity. ICE and CBP have contributed to impunity by making it difficult for victims, witnesses, or independent investigators to identify them, actions which obstruct residents' ability to identify who violated their rights in individual cases. That impunity, in turn, is designed to make the public fear and feel powerless against DHS agents, believing they are beyond accountability, no matter what they do.

145. The risk of this confusion was known to the government. The FBI reportedly issued a law-enforcement bulletin to DHS identifying at least five instances in 2025 involving kidnappings, attempted rapes, and robberies effectuated by masked men claiming to be immigration officers, and urged agents to identify themselves. Minneapolis and Saint Paul residents in fact called 911 to report unidentified masked men and people being kidnapped by unidentified people.

146. The agents also affirmatively impersonated local police, using vests marked POLICE, vehicles with police lights, and yellow police tape, which forced the Saint Paul Police Department to order reflective magnetic badges for its own unmarked vehicles to distinguish itself from federal agents.

147. Defendants' own written policies required the opposite. The 2023 DHS use-of-force policy provides that, when feasible, agents must attempt to identify themselves, issue verbal warnings, and afford a reasonable opportunity for compliance before applying

force; a 2021 Border Patrol use-of-force policy contains requirements that officers identify themselves as law enforcement and issue warnings before using force when feasible.

**B. The agents roved the public streets and highways stopping people because of their perceived race, ethnicity, and national origin**

148. DHS abandoned its prior practice under which, as Defendant Homan put it in 2017, ICE "do[es] not conduct neighborhood raids or sweeps; instead, our officers go to a specific location to locate a specific individual." DHS adopted instead a policy of roving patrols, under which agents accosted residents they randomly encountered and questioned them about their citizenship and immigration status without any articulable basis to do so—other than their race.

149. The policy was quota-driven. Arrest quotas were set at seventy-five arrests per field office, or more than 1,800 nationwide per day, in January 2025, and raised in May 2025 to 3,000 nationwide daily. ICE's acting Executive Associate Director for Enforcement and Removal Operations, Marcos Charles, told agents, "We need to turn up the creative knob up to 11 and push the envelope," and agents were directed by email that all collaterals encountered needed to be interviewed and that anyone found to be amenable to removal needed to be arrested.

150. The patrols targeted the streets of predominantly Somali and Latino neighborhoods, including the Lake Street corridor, a six-mile east-west thoroughfare in south Minneapolis, where DHS officers became a constant presence. Within a week of the operation's start, Latino business owners along Lake Street and in Saint Paul described the operation in the same terms the Somali community used. The owner of Colonial Market

and Restaurant on Lake Street said of the agents, "They are snatching people from the streets," and that his customers are "fearful because they are Latinos being targeted by ICE"; another business owner asked, "What did I do to deserve so much hate to us? What did we do?" The policy caused chaos and disruptions on State- and City-managed property, roads, and sidewalks.

151. A survey conducted by the U.S. Immigration Policy Center found that, among Minneapolis respondents who reported at least one interaction with federal immigration enforcement agents, 43.9 percent said they were randomly stopped on the street while walking and 54.0 percent said they were randomly pulled over while driving; 58.5 percent were asked about their immigration or citizenship status; and 46.7 percent said agents did not believe they were lawful permanent residents or citizens despite being shown identification. Residents of color were seventy-three percent more likely than white residents to be disbelieved about their lawful status after demonstrating it.

152. The roadway stops were systematic and violent. Federal agents repeatedly maneuvered their vehicles to box in or otherwise physically trap civilian vehicles on public streets, stopped abruptly in front of them, blocked roads, activated emergency lights, drew and pointed firearms, smashed windows with glass-breaking batons, and pulled people from their cars. The State of Minnesota received reports of blockades at shopping areas where roving groups of DHS agents blocked all traffic and demanded the citizenship of the riders in every car, far away from where border checkpoints could be lawful. The State also received reports of DHS agents using their vehicles in unsafe, aggressive ways that either intentionally or recklessly risked injury to others or actively caused collisions. On January

12, 2026, an ICE vehicle rammed a Hispanic United States citizen's car from behind in south Minneapolis immediately after the ICE agents turned their lights on. The agents had no basis to believe the citizen was undocumented.

153. On January 8, 2026 — the day after Renee was killed — DHS agents pulled someone out of a vehicle in the middle of the road and departed the scene, leaving the vehicle in the middle of the street and not even placed in park; local law enforcement responded after reports that the vehicle had rolled and blocked traffic.

154. Operation Metro Surge required the Minneapolis Police Department to respond to more than thirty ICE-related incidents between December 9, 2025, and January 12, 2026, including calls from citizens who reported they were witnessing kidnappings by unidentified people.

**C. People of Somali descent or origin and Hispanic residents were stopped and seized irrespective of immigration status**

155. The operation swept up United States citizens and lawful permanent residents of Somali descent or origin as well as Hispanic citizens and residents as a matter of course. During Metro Surge, United States citizens and immigrants alike were racially profiled as they merely went about their days. They were approached by federal agents while driving, while at work, or while shoveling snow; abruptly stopped on the street by masked federal agents as they ran errands; often asked about their immigration status; and often arrested without warrant or any stated or apparent reason. Minnesota residents of Somali and Latin American descent were notably targeted even though the overwhelming majority of these communities are United States citizens or hold green cards.

156. The following are among the documented examples:

a. **Ali Dahir**, a forty-four-year-old Somali-American United States citizen naturalized in 2006, was surrounded on December 2, 2025, by five masked and vested officers in his apartment building. An officer said they were looking for somebody who looked like him. He was detained twenty-five to thirty minutes despite producing both a driver's license and a passport card. A federal court found that Dahir was stopped and detained based solely on his race or ethnicity.

b. **Mubashir Khalif Hussen**, twenty, a Somali-American United States citizen, was seized on or about December 10, 2025, in the Cedar-Riverside neighborhood by two masked agents who exited an unmarked SUV, followed him into a restaurant, dragged him outside, tackled him, slammed him against a stairwell doorframe, pushed him face-down in the snow, and put him in a chokehold while he protested ("I'm a U.S. citizen, bro!") and while they ignored the passport photograph he attempted to show them. They transported him to the Bishop Henry Whipple Federal Building, shackled his legs, and fingerprinted him before releasing him roughly two hours later without charge. The agents were masked and wearing no identification.

c. **Mahamed Rufai Eydarus** and his mother, both United States citizens, were surrounded on the street on December 10, 2025, as described above, with Bergquam riding in the federal vehicle and filming, and a federal judge found they "were stopped and detained based solely on their race or ethnicity."

d. **Abdikadir Abdi Noor**, forty-three, a Somali American who has been a United States citizen for approximately twenty years, was tackled and arrested near Karmel

Mall on December 15, 2025 and was detained and disparaged for his national origin as a Somali American. Four masked, vested agents surrounded his car; other agents broke the windows of an adjacent car occupied by two Latino men and pulled them out.

e. **Said Osman**, a Somali man lawfully present in the United States, was walking to his mosque near Karmel Mall in traditional Muslim clothing on January 8, 2026, when two masked men grabbed his arm and pinned him on the ground, refusing to let him show identification. The agents ignored a white pedestrian nearby. A federal court found that Osman was stopped and detained based solely on his race or ethnicity.

f. **A.A.**, thirty-nine, a Somali lawful permanent resident, was grabbed by two masked ICE officers on January 9, 2026 while putting groceries in his car in a Burnsville parking lot; they searched his pockets and ignored the green card in his wallet, and placed him in an unmarked sedan. The court found that "[t]he officers never identified themselves, presented a warrant, indicated that they knew A.A. before arresting him, or asked about his ties to the community or family." A federal court found that A.A. was stopped and detained based solely on his race or ethnicity.

g. **H.S.**, a Somali-American United States citizen who wears a hijab, was stopped on January 12, 2026, in a Dollar Tree parking lot, given three seconds to produce a photograph of her passport, handcuffed, had her phone seized and turned off, and was driven around for approximately an hour. A federal court found that agents stopped and detained H.S. solely because of her race or ethnicity.

h. **Mustafa Mohamed**, a Somali-American United States citizen, was surrounded by five ICE agents at a Shakopee gas station on January 15, 2026, dragged

from his car, and subjected to a knee in the back and an elbow to the neck. Mr. Mohamed yelled that he was a U.S. citizen, but the agents did not accept that answer and repeatedly asked him where he was born and what country he was from. A federal court found that Mr. Mohamed was detained solely because of his race or ethnicity.

i. **F.A.**, a twenty-two-year-old Somali-American United States citizen who wears a hijab, was pulled over by two ICE vehicles in Rogers, Minnesota on January 21, 2026, by five agents, two or three of whom had guns drawn. The court found that the agents did not have clothing identifying them as ICE, DHS, or Border Patrol, gave no reason for the stop, presented no warrant, and told her that her valid identification looked fake. A federal court found that F.A. was stopped because of her skin color, appearance, and hijab.

157. Hispanic Minnesotans were seized on the same basis. Following an evidentiary hearing, a federal court found that agents during Operation Metro Surge "stopped Somali and Hispanic individuals without reasonable suspicion while they did not stop similarly situated nearby white individuals," and that "[t]he only salient factor in these cases was the individual's race or ethnicity."[3] The federal court made specific findings as to the following instances:

**a.** **Luisa Doe**, a Latina woman from Honduras who has lived in Minnesota since 2019 and has a pending asylum application, was pulled over while driving in Saint Paul on December 12, 2025. An agent asked her name, then handcuffed her and put her in an ICE vehicle. Another agent scanned her face with a phone. The agents never presented a

[3] Findings of Fact, Conclusions of Law, and Order, *Hussen v. Noem*, No. 0:26-cv-00324-ECT-ECW (D. Minn. Mar. 9, 2026) (Tostrud, J.), at 86.

warrant, explained the arrest, or asked about her ties to the community. She was transferred to the Douglas County Jail in Wisconsin. As to the stop, the court found that Luisa was stopped solely because of her skin color and appearance: "Defendants have presented no other reason to explain why the agents pulled Luisa over."

**b.** **Crisareli Castillo**, a United States citizen of Mexican descent who teaches infants and toddlers at a Spanish-immersion daycare in the Longfellow neighborhood, and her co-worker Rosa, an Ecuadorian asylum seeker with a valid work permit, were boxed in by masked ICE officers as they arrived at work on January 7, 2026. An officer showed Castillo a photograph of a Latina woman neither of them resembled. About ten white bystanders stood nearby and were asked for nothing. Rosa was handcuffed and flown to Texas within two days. The court found: "I find that Ms. Castillo and Rosa were stopped based solely on their race or ethnicity."

**c.** **E.M.**, a Mexican-American United States citizen from Maplewood, had her car boxed in by immigration agents while she was driving near her neighborhood on January 7, 2026. The agents wore clothing that identified no agency. They checked her driver's license and passport and returned them. When she objected, an agent answered, "You need to stop! If you don't I am going to detain you whether you are a citizen or not for reckless driving." The court found: "I find that E.M. was stopped based solely on her race or ethnicity."

**d.** **Jonathan Aguilar Garcia** and his co-worker Andres, both Hispanic United States citizens, were delivering drive-up orders at a Target in Richfield on January 8, 2026 when Border Patrol agents, including Defendant Bovino, demanded to know whether they

were citizens. An agent tackled Aguilar Garcia inside the store's doors, others piled on, one pressed a knee to his neck, and they dragged him handcuffed to an SUV as he shouted that he was a citizen with his passport on him. White bystanders who also yelled at the agents were not "questioned, photographed, harassed, followed, tackled, or arrested"; "only Mr. Aguilar Garcia and Andres were." The court found: "I find that Mr. Aguilar Garcia was stopped and detained based solely on his race or ethnicity."

**e.** **Mark Castillo**, a Hispanic United States citizen born in Texas who lives in Saint Paul, was taking out the trash at his apartment building on January 9, 2026 when four ICE vehicles "cornered" him and agents asked whether he had a birth certificate. He said he was born in Texas and produced his Minnesota driver's license. He swore that the agents "saw a man who looked Mexican and pounced on him" and had "no reason to think" he was violating any immigration law. The court noted that Defendants offered no contrary evidence and held, "I agree with Mr. Castillo."

**f.** **Julio Cesar Martinez Garcia**, a Hispanic United States citizen, was working at a house in Brooklyn Center on January 9, 2026 when two Border Patrol agents drove past, made a U-turn, and asked where he was born. He said he was a citizen and produced his driver's license and REAL ID paperwork. The agents called the papers fake and the license worthless, handcuffed him, ran a facial recognition scan that told him he had been born in Mexico City, and drove him around for about thirty minutes until a second scan confirmed his citizenship. The court found that he "was stopped and detained based solely on his race or ethnicity" and that the assertions about his papers were "unsupported, pretextual justifications for prolonging the detention."

g. **Raul Aguirre Castrejon**, a Hispanic lawful permanent resident, was a passenger in a car his niece was driving in Monticello on January 10, 2026 when two ICE vehicles swerved in front of them, forcing her to brake to avoid a collision. Roughly twenty agents and twelve vehicles converged. Officers handcuffed him, refused to let him produce his residence card, and told him, "you're not from here. Where are you from?" They said the stop was made because the car was registered to a man and driven by a woman. The court answered: "I do not understand how the fact that a male-owned vehicle is being driven by a female might in any rational world give immigration officers reasonable suspicion to believe an immigration-related offense is being committed. The explanation is incredible and, I conclude, pretextual."

h. **Antony Doe**, a Latino man from Honduras with a valid work permit and a pending U visa application, was delivering food in Brooklyn Center on January 10, 2026 when six or seven ICE vehicles entered the lot and two agents pointed guns at his car. An agent yelled, "Are you legal?" Agents pulled him out, scanned his face, handcuffed him, and kept his driver's license. He was flown to El Paso the next day and not returned to Minnesota until January 20. The court agreed with his account that he was stopped and arrested "solely because of his skin color and ethnicity."

i. **K.D.**, a Latino United States citizen from Burnsville, was walking to his car in a Walgreens parking lot on the Richfield–Bloomington border on January 11, 2026 when four or five ICE officers jumped out of a vehicle and surrounded him. Two questioned him in Spanish about where he was born and whether he was a citizen. He produced a driver's license. After about ten minutes the officers left without a word, having never indicated

they knew his name, presented a warrant, or explained the stop. The court found: "I find that officers stopped K.D. solely because of K.D.'s race or ethnicity."

**j.** **Christian Eduardo Molina Silva**, a Hispanic United States citizen from Coon Rapids who testified at the evidentiary hearing, was driving in south Minneapolis on January 12, 2026 when a black car with tinted windows pulled out of an alley and followed him. Its emergency lights came on, and as he moved to park, the ICE vehicle rammed his car from behind. An agent demanded proof of citizenship. The encounter lasted forty-five to sixty minutes. The agents promised to pay for the repair and never provided insurance information. The court found: "I find that agents stopped Mr. Molina solely because of his race or ethnicity."

**k.** **Pedro Moreno**, a lawful permanent resident from Mexico, was working inside a house at his construction job on January 13, 2026 when at least six ICE vehicles arrived. An agent asked where he was from, and when he produced his green card the agent "said it was fake and that they had no way to prove it is real." He was handcuffed and taken to Fort Snelling, where an officer reviewed his documents and released him. On the drive back an agent told him it "[s]erves you right for running away"; the other agent said he had not run. The court found that he was stopped because he looks Hispanic, Defendants having offered no explanation for the stop or for doubting his green card.

**l.** **Ramon Menera**, a Hispanic naturalized United States citizen born in Mexico who lives in Columbia Heights and testified at the evidentiary hearing, was standing on his own property on January 14, 2026 when an ICE agent asked where he was from. Told that he was from this country, the agent answered, "Now, talking to you, seeing you, hearing

that you have an accent, I have reason to believe that you are not born of this country." Asked again for a reason, the agent said, "because of your accent," and gave none other. Agents handcuffed him and scanned his face, which showed he was a citizen. The arresting agent resisted the supervisor's release order two or three times and, before letting him go, whispered in Spanish, "I don't care if you're a citizen, next time I'm going to take you." About ten other people were filming and protesting; they were not Hispanic and were not questioned. The court found: "I find that he was stopped and detained based solely on his race or ethnicity."

**m.** **N.G.** and her husband, both United States citizens, were parked in a residential area of New Hope on January 14, 2026. Agents observed her husband, who is Latino, from another vehicle. Moments later three ICE vehicles sped toward them and one rammed their car from behind. An agent demanded her husband's identification and asked whether he had entered the country on a visa. Agents asked N.G., who is white, for nothing. The court found: "I find that agents stopped N.G. and her husband based solely on her husband's race or ethnicity."

**n.** **E.G.**, a Mexican-American man from Mounds View, was standing on the front steps of his own home on January 22, 2026 when ICE agents approached, demanded identification, and threatened to arrest him if he refused. After he produced it, an officer asked what country he had been born in. The court found that he was targeted for being Mexican American, observing that standing on his own steps "gave officers the opportunity to observe his race and ethnicity" and gave them no reason to question his immigration status.

**o.** **S.P.**, a Latino United States citizen by birth, was pulled over while driving in Richfield on January 26, 2026 by officers who never identified themselves and who approached with weapons drawn. They asked whether he was "from here" and said his license plate came back to someone in the country illegally; after reviewing his license they said it "must have been someone else." The court found the explanation senseless and therefore pretextual, and agreed that he was stopped "solely because of his race or ethnicity."

158. On January 16, 2026, United States District Judge Katherine Menendez preliminarily enjoined federal officers from stopping or detaining drivers and passengers absent reasonable articulable suspicion of a violation of 18 U.S.C. § 111, holding that "[t]he consistent recurrence of incidents that are similar in all relevant respects illustrates an 'ongoing, sustained pattern of conduct,' . . . where federal law enforcement officers are initiating traffic stops of anyone they suspect to be following them," and that "[t]hese uncontroverted facts establish a violation of Plaintiffs' Fourth Amendment rights because the totality of the circumstances points to no reasonable basis for a Terry stop."[4]

159. On January 31, 2026, in the State of Minnesota's action, the court noted Plaintiffs' showing that "many DHS agents have switched license plates on their vehicles and worn face coverings that conceal their identities, though Minnesota law prohibits such behavior," and found that the documented decline in public trust "is attributable to federal

[4] Order Granting in Part Motion for Preliminary Injunction, *Tincher v. Mullin*, No. 0:25-cv-04669-KMM-DTS (D. Minn. Jan. 16, 2026) (Menendez, J.), at 46, 66, stayed pending appeal, No. 26-1105 (8th Cir. Jan. 26, 2026).

agents' practices of failing to identify themselves, masking, and wearing inconsistent uniforms with inconsistent identification."

160. On March 9, 2026, after a full evidentiary hearing, United States District Judge Eric Tostrud entered findings of fact and conclusions of law holding that the plaintiffs before him "have made a clear showing that Defendants have adopted a policy authorizing federal immigration officers to conduct investigatory stops based on ethnicity or race without reasonable suspicion that the individuals were violating immigration laws," and that "[t]he evidence from individual encounters is compelling and troubling." The court's description of the pattern is precisely the conduct at issue in this case:

> "The stops share similarities. Defendants' agents approached people on the street, or pulled them over in their vehicles, and requested identification without any explanation for why the stop occurred and often without identifying themselves. The only salient factor in these cases was the individual's race or ethnicity. Officers stopped Somali and Hispanic individuals without reasonable suspicion while they did not stop similarly situated nearby white individuals. Race or ethnicity alone cannot furnish reasonable suspicion."[5]

161. The court further held that the plaintiffs had made a clear showing that there was no reasonable articulable suspicion supporting the stops of twenty-three individuals; that those individuals "were stopped based solely on their race or ethnicity"; that the record

[5] Findings of Fact, Conclusions of Law, and Order, *Hussen v. Noem*, No. 0:26-cv-00324-ECT-ECW (D. Minn. Mar. 9, 2026) (Tostrud, J.), at 85- 86.

was "devoid of facts" supporting reasonable suspicion; that the stops "became de facto arrests because of the handcuffing, excessive force, and refusal to examine the proffered identification"; and that Defendants "adopted a policy authorizing federal immigration officers to conduct warrantless arrests without probable cause." The court noted that Defendants "acknowledged at oral argument that they did not have a policy to make a record of Terry stops."[6]

162. Those findings were not new. They repeated what two other federal courts had already found about the same tactics deployed by Defendant Bovino against Hispanic communities in Los Angeles and Chicago in the six months preceding. Defendants had been told by the judiciary, twice, before a single agent set foot in Minneapolis, that stopping people on the basis of apparent ethnicity is unlawful, and they sent the same commander to do it again.

**D. The operation's results confirm its discriminatory design**

163. The operation's announced predicate (Somali-linked fraud) and its conduct (the unlawful targeting and harassment of people of Somali descent and origin by federal agents) bore no relationship to Metro Surge's immigration arrest outcomes. Federal arrest data shows that of the thousands arrested between December 1, 2025, and March 10, 2026, fewer than three percent, approximately 106 people, were Somali. Ecuador accounted for 1,026 arrests and Mexico for 885.

---

[6] Findings of Fact, Conclusions of Law, and Order, *Hussen v. Noem*, No. 0:26-cv-00324-ECT-ECW (D. Minn. Mar. 9, 2026) (Tostrud, J.), at 77, 85-86, 89.

164. Of the more than 3,500 people detained, only two were ultimately deported to Somalia. Nearly two out of three immigrants arrested had no prior United States criminal history whatsoever. Fewer than a quarter of those arrested had any criminal conviction, under an agency definition of crime that includes traffic violations and unlawful entry. ICE itself labeled approximately 1,300 of the arrests "collateral," that is, people who were not the target of any operation at all. The arrest data understated the injury to the Somali community in Minnesota because they omitted the serial violations of the rights of U.S. citizens who were unlawfully detained and questioned.

165. The operation inflicted precisely the group-wide injury its architects intended, on both targeted communities. Somali-owned businesses along Lake Street and at Karmel Mall, repeatedly targeted by agents, suffered devastating losses. Latino-owned businesses on the same corridor and on Saint Paul's West Side suffered much the same, and community organizations documented the resulting displacement and disappearances. Three daycares featured in Shirley's video sued state officials, alleging that the State suspended their funding and abandoned them to appease the federal government; the owner of one, Umi Hassan, said: "I have never thought in my life in being a U.S. citizen i need to take my passport to buy milk." Many United States citizens of color began to carry their United States passports wherever they went. The economic damage to Minneapolis alone was estimated at more than $200 million.

## IV. THE KILLING OF RENEE NICOLE MACKLIN GOOD

### A. The morning of January 7, 2026

166. On the morning of Wednesday, January 7, 2026, Renee and Becca dropped Renee's six-year-old son at school. As they returned home they encountered ICE agents who were part of Operation Metro Surge. Like many members of their community, they were concerned about ICE's conduct and its effect on their friends and neighbors.

167. Renee was driving the couple's Honda Pilot, which also carried their dog. She stopped the vehicle on Portland Avenue between 33rd and 34th Streets in Minneapolis. Exercising her First Amendment rights, Becca exited the vehicle and began filming ICE activity while Renee remained in the car and honked her horn to warn her neighbors.

168. While the Honda Pilot was stopped in the street, it was not preventing cars from proceeding. Approximately eleven vehicles (including the Chevrolet Tahoe driven by Defendant Ross) drove around it while it was stopped.

169. The vehicles in which the agents arrived were unmarked. Defendant Ross's Chevrolet Tahoe bore a license plate that was not registered with the State of Minnesota.

170. The agents who confronted Renee were masked. At least three federal agents wearing masks, including Defendant Ross, walked toward Renee's Honda Pilot in the seconds before the shooting; and it was a masked agent in tactical gear who turned away the aid offered to her as she lay dying. Consistent with the standard practice of DHS agents deployed in Operation Metro Surge as alleged above, the agents wore no visible individual identification such as a name or badge number, and none identified himself. To the extent any agent present was not captured on the videos, Plaintiffs allege upon information and

belief (based on the videos, on the operation's uniform masking practice, and on the fact that the agents' identities and appearance are otherwise within Defendants' exclusive knowledge) that he, too, was masked and unidentified.

171. Renee Good was not the target of any law enforcement investigation. She had no criminal history. ICE agents have no authority to enforce Minnesota traffic laws, and no agent at the scene possessed any evidence or information that Renee had engaged in unlawful obstructive conduct.

**B. The encounter**

172. After driving past the Honda Pilot, Defendant Ross got out of his vehicle, already filming with his cell phone, which was initially in his right hand before he moved it to his left. He immediately walked directly in front of the Honda Pilot and proceeded to the driver's side window.

173. As Ross walked past the open driver's side window, Renee said to him: "That's fine dude. I'm not mad at you. I'm not mad at any of you." Ross continued circling the car, interacted with Becca, and then began walking back toward his own vehicle.

174. As Ross was returning to his vehicle, two ICE agents stopped a pickup truck on the other side of the Honda Pilot. Renee motioned for them to go around her and said, "just go around." Instead of proceeding around the car, as eleven vehicles had already done, the agents got out of their truck, and one of them commanded: "Out of the car. Get out of the fucking car."

175. On information and belief, another ICE agent gave Renee an instruction to leave the scene.

176. As the agents got out of the pickup truck and commanded Renee from the car, Becca Good was standing beside the front passenger door of the Honda Pilot, a few feet from Renee.

177. One of the agents attempted to open the front driver's side door and reached inside the window as Renee began to slowly reverse the vehicle. He had no authority to do so, as Renee was not obstructing any ICE activity and ICE agents have no jurisdiction to enforce local traffic laws. On information and belief, part of the agent's purpose in conducting himself in this manner was to further the conspirators' goals of accosting residents who voiced objection to ICE's operations and to have such encounters be filmed.

178. Meanwhile, Defendant Ross, still holding his phone in his left hand, walked back in front of Renee's vehicle, a few feet from the front of the car. On information and belief, part of Ross's purpose in filming in this manner was to create social media content of violent encounters between agents and people protesting or monitoring the agents' activity.

179. Renee turned the wheels of the vehicle to the right, away from Ross, who was positioned at the front left of the vehicle. She began to move slowly forward, the vehicle beginning a right turn, away from Ross and the other agents.

180. As Renee began to move the vehicle slowly forward, Becca stepped back from it. When Defendant Ross fired, Becca was standing a few feet from the rear passenger-side taillight of the vehicle, within feet of his fire.

181. Defendant Ross then simultaneously moved away from the vehicle, his legs and body out of the vehicle's path, while drawing his firearm and leaning forward to shoot

into the vehicle. As he leaned forward to shoot, his left hand, still carrying his cell phone, contacted the car near the left headlight as the car moved past him.

182. Ross, leaning forward, with his legs, head, and body out of the path of the vehicle, fired the first shot into the bottom left of Renee's windshield. As the car continued its slow right turn away from him, he fired two more times into the open driver's side window.

183. At no time was Ross at risk of being run over by the vehicle. To the extent his arm contacted the vehicle near the time of the first shot, it is because he intentionally leaned forward to position himself to shoot. By the time he fired the second and third shots, he was squarely on the side of the vehicle, firing through the open driver's side window as Renee was slowly driving away.

184. Each of Ross's shots was fired in violation of mandatory Department of Homeland Security policies prohibiting the use of deadly force solely to prevent the escape of a fleeing individual, prohibiting the discharge of firearms at the operator of a moving vehicle, prohibiting agents from intentionally placing themselves in harm's way, and requiring agents to consider the implications of an out-of-control conveyance before firing at a driver.[7]

185. After Ross shot Renee, her car careened down the street, out of control, until it struck a parked car. As it did, Defendant Ross said, "fucking bitch."

---

[7] U.S. Dep't of Homeland Security, Policy Statement 044-05 (Revision 01), Update to the Department Policy on the Use of Force (Feb. 6, 2023), https://www.dhs.gov/sites/default/files/2023-02/23_0206_s1_use-of-force-policy-update.pdf, at 8-9.

186. Becca ran down the street after Renee's car. She reached it where it had come to rest against a parked car and found Renee with a gunshot wound to her head.

187. The fact that the vehicle careened out of control after the shooting demonstrates the very danger DHS policy is designed to prevent: shooting the driver of a moving vehicle increases rather than reduces the risk to anyone in its path. Ross fired into a dense residential neighborhood; Minneapolis Police Chief Brian O'Hara, arriving at the scene, tried to determine which direction the gun had been pointed and how many rounds had been fired, because he wanted to make sure no one else had been hit.

188. Despite knowing that Renee had been shot, neither Ross nor any of the other ICE agents present rendered medical aid to her.

189. To the contrary, when a person on the street offered assistance, an ICE agent responded, "No, back up, now!" When that person identified himself as a physician, the agent responded, "I don't care." There was no active threat to any agent at any moment, and thus no barrier to the provision of medical care.

190. The Minneapolis Fire Department found Renee in her vehicle, applied a tourniquet to her left arm and a chest seal, carried her to meet emergency medical services, and began chest compressions. Renee arrived at Hennepin County Medical Center at 10:03 a.m. She had no pulse and was pronounced dead at 10:30 a.m.

191. An independent autopsy revealed that Renee had at least three gunshot wounds. One entered and exited her left forearm without striking bone. Another entered and exited her right breast. A third, fatal wound entered her left temple and exited the right side of her head.

192. The Hennepin County Medical Examiner recorded the manner of death as homicide, the cause of death as multiple gunshot wounds, and recorded that the decedent was shot by a law enforcement officer.

193. Renee Good suffered immense physical, mental, and emotional pain and suffering in the final moments of her life, together with a total loss of the enjoyment of life.

**C. The injuries to Plaintiff Rebecca Good**

194. Becca Good was made to watch her partner be shot to death from a few feet away, and to find her body moments later. She has been diagnosed with post-traumatic stress disorder and insomnia.

195. Her distress has continuing physical manifestations. She has difficulty sleeping and often wakes in a state of panic with her heart racing. Her heart races when she sees or hears media coverage of the killing, which has been impossible to avoid. She has body aches and chest pains she did not previously experience, traumatic flashbacks to the scene, exhaustion, debilitating headaches, chills, temperature dysregulation, and digestive problems. She lost her appetite, often eating one meal a day, and lost at least fifteen pounds in the weeks after the shooting.

196. Defendants' public campaign against her and Renee, as pled below, compounded the injury. Because senior federal officials, including the President and Defendant Noem, publicly branded Renee a terrorist and a criminal within hours of her death (as discussed below), Becca lost her privacy along with her partner and has been made to relive the killing as a subject of national argument. She has received continuous

threats. She was unable to live in her home for more than a month, has hired security staff to protect it, and has installed a security system and window film.

**D. The reactionary federal response**

197. Within hours, before any investigation had begun, senior federal officials publicly declared Renee responsible for her own death. DHS issued a statement claiming that she had tried to kill ICE officers with her vehicle in an act of domestic terrorism, and blaming sanctuary politicians for creating an environment that encourages rampant assaults on law enforcement. This account was entirely inconsistent with any reasonable analysis of the available evidence, which shows that Renee attempted to slowly pull away from the officers, with no one in her path.

198. At 2:28 p.m. on January 7, 2026, the President posted on Truth Social, saying, without evidence, that Renee Good was a "professional agitator" and claiming that she "violently, willfully, and viciously ran over the ICE Officer," and blaming the "Radical Left" for "threatening, assaulting, and targeting our Law Enforcement Officers and ICE Agents on a daily basis." The following day, asked about his view by New York Times reporters, he repeated the claim and asked an aide to play video of the scene on a laptop.

199. DHS's Assistant Secretary for Public Affairs, Tricia McLaughlin, told PBS News that the officer fired defensively, "fearing for his life"; she called Renee Good a "violent rioter" who "weaponized her vehicle" in "an act of domestic terrorism"; and she stated that "the ICE officers who were hurt are expected to make full recoveries." On January 20, 2026, asked about the status of the officer who shot her, ICE Enforcement and Removal Operations official Marcos Charles said only that the officer was "recovering at

home," and declined to say whether he remained on administrative leave or involved in the operation.

200. On the morning of the shooting, as is standard practice in shootings by officers, including those by federal officers, the Minnesota Bureau of Criminal Apprehension ("BCA") arrived at the scene and began investigating alongside federal investigators, and the Bureau and the leadership of the FBI's Minneapolis Field Office agreed to conduct a joint investigation. The First Assistant United States Attorney confirmed that agreement to the Hennepin County Attorney's Office that same morning.

201. That afternoon, BCA agents went to the Whipple Federal Building to interview the federal officers involved. FBI agents told them they would be included. Less than an hour later, however, the BCA's agents were told that the position of the federal government had changed and that Homeland Security Investigations would not allow them to be present. BCA's requests for even the most basic information, such as the names of the involved federal officers, were ignored.

202. On the evening of January 7, 2026, the United States Attorney for the District of Minnesota confirmed to the BCA's Superintendent that there would be no joint investigation and no federal cooperation or evidence sharing with state officials. On January 8, 2026, the federal government formally revoked the BCA 's access to the evidence, and Superintendent Drew Evans announced that the BCA would "no longer have access to the case materials, scene evidence or investigative interviews."

203. According to persons familiar with the decision, both Ross and ICE agreed to a use-of-force investigation. A high-ranking White House official overruled them, and the BCA was then shut out of the investigation entirely.

204. Federal authorities removed Renee Good's vehicle from the scene before local investigators could complete normal processing. Ordinarily the BCA would have completed three-dimensional scans of the scene, analyzed bullet trajectories, and taken precise measurements of cartridge casings and vehicles; instead, federal investigators quickly processed the scene and then removed key physical evidence before local investigators could conduct their work.

205. After shutting out the BCA, the federal government promptly terminated its own investigation into Ross and the agents on the scene. On January 18, 2026, Deputy Attorney General Todd Blanche stated on national television: "We investigate when it's appropriate to investigate. And that is not the case here. . . . So no, we are not investigating."

206. Defendant Noem asserted publicly that the State of Minnesota had no jurisdiction over the investigation, and the President stated that there would be no federal cooperation because Minnesota officials were "crooked." By the time of those statements, federal authorities had already taken exclusive possession of key pieces of evidence.

207. The federal government instead turned its investigative apparatus on Becca and on the state officials who objected. Multiple prosecutors and agents within the Department of Justice resigned, at least in part because of the refusal to criminally investigate Ross. Those who resigned included an FBI agent who was pressured to discontinue a civil rights inquiry into the federal agent who shot Renee in favor of an

investigation of Becca. On January 13, 2026, a majority of the United States Attorney's Office leadership team in Minnesota resigned, and dozens more left in the following weeks. Senior FBI officials, including the Director, instructed agents to stop investigating the killing over concerns that pursuing a civil rights investigation would undermine the President's claims that Renee had tried to kill an officer, and pressured prosecutors to investigate Becca instead.

208. On January 20, 2026, the Department of Justice served subpoenas on the Minnesota Attorney General, the Governor, the Mayor of Minneapolis, the Hennepin County Attorney, and the Mayor of Saint Paul, alleging disruption of ICE operations in the State.

209. On February 2, 2026, the Hennepin County Attorney's Office served formal demands on DHS and the Department of Justice under 5 U.S.C. § 301 and the agencies' *Touhy* regulations for evidence relevant to its criminal investigation of Renee Good's killing, including the firearms used, audiovisual evidence containing contemporaneous statements by the officers involved, reports, witness accounts, medical reports, operational plans, and the officers' employment, training, and disciplinary records. DHS obtained an extension, then on March 3, 2026, refused, asserting that its *Touhy* regulations do not apply to the disclosure of official information to federal, state, or local law enforcement authorities related to criminal law enforcement investigations, and referring the County Attorney to the Department of Justice. The Department of Justice never responded at all.

210. On March 18, 2026, the FBI informed the BCA that the Department of Justice and DHS had decided that evidence related to Renee Good's killing would not be

released or made available to the Bureau at all, and had directed the FBI to turn the evidence over to the DHS Office of Inspector General only.

211. On March 24, 2026, the State of Minnesota, the Hennepin County Attorney, and the Bureau's Superintendent sued the Department of Justice and DHS in the United States District Court for the District of Columbia, alleging that the withholding represented an effort to impair state investigations that the federal defendants would prefer Minnesota not pursue and to frustrate any resulting charging decisions.

212. As of the filing of this Complaint, Defendant Ross has not been charged, indicted, disciplined, or publicly identified by the United States, and, on information and belief, no meaningful federal investigation of Renee's killing has been conducted. By contrast, two other federal agents were criminally charged by Minnesota prosecutors for conduct during Operation Metro Surge once state investigators were able to obtain evidence: an ICE Enforcement and Removal Operations agent detailed to the Minneapolis area was charged on April 16, 2026, with two counts of second-degree assault for pointing a gun at two motorists on a public highway, and an ICE agent was charged on May 18, 2026, with four counts of second-degree assault and one count of falsely reporting a crime arising from a January 14, 2026 shooting.

## V. EACH DEFENDANT'S PARTICIPATION IN THE CONSPIRACY AND EACH DEFENDANT'S ANIMUS

213. This Section pleads, for each Defendant and for certain of the conspiracy's non-party private participants, the part that each played in conceiving, ordering, designing, commanding, executing, publicizing, or ratifying Operation Metro Surge. No Defendant is

alleged to be liable, and no co-conspirator is alleged to have participated, merely by association. Each is alleged to have joined the agreement to conduct Operation Metro Surge, to have understood its object, and to have taken acts of his or her own in furtherance of it. President Trump is not a defendant in this action; his statements and his direction of the enforcement apparatus are pleaded above, and the purpose he set is imputed to each person who joined the enterprise and carried it out.

**A. Defendant Stephen Miller**

214. Defendant Miller is liable as the conspirator who converted the President's stated animus into the operation's daily orders. He publicly defined Minnesota's fraud in ethnic rather than individual terms, described the presence of Somalis in Minnesota as an injury to the State, and identified the civil rights laws themselves as the obstacle to be overcome. He conducted the daily conference calls on which the Minneapolis deployment was directed, demanded daily arrest reports from the enforcement agencies, set the numerical quotas that produced the roving-patrol method, and ordered agents dispatched to the areas of Minneapolis where observers and protesters had gathered, in order to force confrontations with them. He has acknowledged that the White House issued protocols governing which federal personnel performed which functions in Minneapolis and that the White House evaluated compliance with them.

215. During the period at issue Miller repeatedly defined the object of federal enforcement in Minnesota in ethnic rather than individual terms, calling it "the Somali fraud operation in Minnesota," claiming that federal records showed seventy-five percent of Minnesota's Somali population was on welfare, and asserting that Americans of Somali

descent exhibit "persistent issues in every subsequent generation." He directed the operations of Operation Metro Surge, and of the city operations that preceded it, through daily morning conference calls with the senior leadership of the Department of Homeland Security, including Defendants Noem and Lyons, on which he issued operational orders with what participants understood to be the authority of the President himself, including, during Operation Metro Surge, orders that agents be dispatched to identified areas of Minneapolis to "force confrontations" with those observing and protesting the operation.

216. Defendant Miller's hostility to immigrants of color as a class, and to Hispanic immigrants in particular, is documented in his own words over a period of years. In November 2019 the Southern Poverty Law Center published more than 900 of his private emails to editors at Breitbart News, more than eighty percent of which concerned race or immigration. In them Defendant Miller promoted material from the white-nationalist website VDARE and recommended *The Camp of the Saints*, a French novel depicting the destruction of Western civilization by the immigration of nonwhite refugees.

217. **December 5, 2025.** On Fox News' *Hannity* program, Defendant Miller described the Minnesota fraud as "the single greatest theft of taxpayer dollars through welfare fraud in American history," characterizing it as an operation carried out by Somali migrants and predicting it would upend American politics.

218. Defendant Miller labeled the object of federal investigation "the Somali fraud operation in Minnesota" and claimed that federal records showed seventy-five percent of the Somali population of Minnesota was on welfare, which he characterized as likely an undercount of the community's financial burden.

219. **December 11, 2025.** In a televised interview, Defendant Miller asserted that Americans of Somali descent exemplify failed immigrant groups; that the failure is not confined to the first generation but that one sees "persistent issues in every subsequent generation." Miller expressed nostalgia for the national-origin quota regime of the 1920s that favored Northern and Western Europeans.

220. Defendant Miller was reported during the same period to have asked, rhetorically, "If Somalians cannot make Somalia successful, why would we think that the track will be any different in the United States?"

221. In January 2026, days after Defendant Ross killed Renee Good, DHS reposted on X a months-old interview clip of Defendant Miller declaring: "To all ICE officers: You have federal immunity in the conduct of your duties and anybody who lays a hand on you or tries to stop you or tries to obstruct you is committing a felony. . . . [N]o one—no city official, no state official, no illegal alien, no leftist agitator or domestic insurrectionist—can prevent you from fulfilling your legal obligations and duties."

222. Defendant Miller, as the administration's senior homeland-security official, directed and participated in the decisions to launch, target, staff, and escalate Operation Metro Surge, as alleged in the paragraphs that follow, and his contemporaneous public statements defining the enforcement target as the Somali community evidence the operation's discriminatory purpose.

223. Defendant Miller directed the operations of the administration's immigration-enforcement campaign through daily 10:00 a.m. conference calls, held every day, including Saturdays, with the leadership of the federal enforcement agencies.

According to senior officials who participated in them, Miller used the calls to demand progress reports on the mass-deportation campaign and to issue orders to the FBI, CBP, ICE, HHS, and the Department of Defense. In May 2025 he set a quota of 3,000 immigration arrests per day, and he demanded daily updates on hiring, detention capacity, and deportation flights. In the words of one senior participant: “He gets on the phone and he yells at everybody. Nobody is spared from his wrath.”

224. The daily calls were attended by the most senior officials of the Department of Homeland Security, including Defendants Noem and Lyons. Senior Department officials have described Defendant Miller as berating the Department’s leadership on the calls and threatening to fire officials who did not carry out his orders; as one put it, “Stephen purports to speak with the authority of the President himself, and he makes that very clear on the calls.” Reporting based on administration sources described Defendant Noem’s decisions and statements as head of the Department as made at Defendant Miller’s behest.

225. During Operation Metro Surge, Defendant Miller used the daily calls to direct field deployments in Minneapolis. According to two senior Department of Homeland Security officials, Defendant Miller demanded that agents be dispatched to areas of Minneapolis where the Department knew there was a heavy presence of protesters and observers, to “force confrontations” with them. He told the calls’ participants: “If we let them have the perception that their protesting is successful, then the administration will never successfully prosecute interior operations to remove aliens”; the administration therefore needed to “engage these protesters,” who “need to be vanquished by any force necessary.” Defendant Miller was thus at the center of the events that culminated in the

killings of Renee and Alex Pretti; one senior Department official said of him: "He's the architect of Renee Good and Alex Pretti's deaths."

226. Defendant Miller has himself publicly confirmed that the White House issued operational instructions governing the field conduct of Operation Metro Surge. In a January 27, 2026 statement, Defendant Miller said that the White House had instructed the Department to use the additional CBP personnel sent to Minnesota to keep protesters away from apprehension operations, and that "[w]e are evaluating why the CBP team may not have been following that protocol."

227. Defendant Miller's operational command of the city surges predated Minnesota. In May 2025 he summoned the head of every ICE field office to Washington, berated them over arrest numbers, ordered them to "just go out there and arrest illegal aliens," and, together with Defendant Noem, demanded 3,000 arrests per day. That directive produced the surges into Los Angeles, Washington, Chicago, and Portland, of which Operation Metro Surge was the culmination. Each of those earlier surges was directed at a Hispanic population: Los Angeles, where a federal court found that agents stopped people on the basis of apparent race or ethnicity, the speaking of Spanish or of accented English, presence at a car wash or day-laborer site, and the type of work they did; and Chicago, where the operation was concentrated in Little Village and other Mexican-American neighborhoods.

**B. Defendant Kristi Noem**

228. Defendant Noem is liable as the conspirator who committed the Department of Homeland Security to the agreement to conduct Operation Metro Surge and supplied its

institutional apparatus. She established and maintained the policies under which the operation's agents concealed their faces and their vehicles' license plates. She selected Defendant Bovino for the Minneapolis field command with knowledge of the fatality warnings from his Los Angeles command, the racial-profiling complaints against him, and the judicial findings entered against him in Chicago weeks earlier. She imposed the requirement that arrests be conducted as filmed spectacle, which put private conspirators inside federal vehicles. She described the operation in the Department's official communications in the ethnic terms the private conspirators had supplied. After Renee Good was killed, Noem publicly declared within hours, and without investigation, that Renee had used her car as a weapon and that Defendant Ross had done nothing wrong.

229. Defendant Noem personally established and maintained the Department's practice of embedding allied private content creators in federal enforcement operations; she personally adopted Shirley's video as the pretext for door-to-door federal enforcement; she personally participated in videotaped operations in Saint Paul; and within hours of Renee Good's death she publicly characterized it as an act of domestic terrorism by the decedent. She participated in Defendant Miller's daily operational conference calls concerning immigration enforcement, including Operation Metro Surge, and during the operation was in near-constant contact with the White House concerning its conduct and messaging. Defendant Noem commanded the Department that designed and executed Operation Metro Surge and personally participated in enforcement, including enforcement staged for the cameras.

230. **October 7, 2025.** Defendant Noem embedded right-wing influencers with her during Portland ICE operations, appearing with them atop the ICE facility while working journalists were denied access, establishing before Minnesota her personal practice of combining federal enforcement with allied private media.

231. **December 29, 2025.** Three days after Shirley posted his video, Defendant Noem announced a massive investigation into childcare and other rampant fraud in Minneapolis; the Department she commanded simultaneously announced door-to-door visits at suspected fraud sites and promised arrests, the sites being, in the main, the Somali-run facilities named by Shirley, whose targets came from the video rather than from any legitimate government investigation.

232. **January 5–6, 2026.** Defendant Noem personally accompanied ICE officers during an arrest in Saint Paul, in tactical vest and knit cap, in a video posted to X in which she tells a handcuffed man, "You will be held accountable for your crimes." It was enforcement conducted as content, in the style of the private conspirators her Department embedded.

233. Under Defendant Noem's command, DHS's official organs published the operation's purpose statements: that the largest DHS operation ever was underway in Minnesota; that the crackdown was tied to fraud allegations involving Somali residents; and that agents were deployed to keep Americans safe and to eradicate fraud. Defendant Noem received Representative Omar's December 12, 2025 letter documenting racial profiling of Somali Minnesotans and took no corrective action: in the twenty-six days between that letter and the killing of Renee Good, the Department she commanded

deployed approximately 2,100 additional agents to the city, proclaimed the operation the largest in its history, dispatched Defendant Bovino to command the Minneapolis streets notwithstanding the warnings and judicial findings alleged below, rescinded no-masking or plate-concealment policies, and disciplined no one for the gross misconduct that was occurring.

234. Within hours of Renee's death, Defendant Noem accused Renee of intentionally ramming her car into federal agents: "Domestic acts of terrorism like this will not stand." She said that Renee had attempted to run a law enforcement officer over and characterized that as an act of domestic terrorism, stating: "An officer of ours acted quickly and defensively shot to protect himself and the people around him." She reposted the Department's domestic-terrorism statement on her own social media. That evening, on the telephone with Governor Walz, she dismissed his concerns and repeated the domestic-terrorism claim; when Walz said, "I hope you can sleep well tonight, Kristi," she answered, "I can."

235. Defendant Noem never retracted the accusation. On March 3, 2026, testifying before the Senate Judiciary Committee concerning Operation Metro Surge, she was asked to retract her characterization of Renee Good and Alex Pretti as domestic terrorists and declined, saying she had been given information from "on the ground." Two days later the President removed her as Secretary, in what national reporting attributed to her handling of the fallout from the killings of Good and Pretti.

**C. Defendant Corey R. Lewandowski**

236. Defendant Lewandowski is liable as a conspirator who commanded the operation and dictated its tactics. The field commander of the operation reported to him and used that chain-of-command to reject the targeted-enforcement directive that would have prevented the roving street confrontation in which Renee Good was killed. Defendants Lewandowski and Noem imposed the standing requirement that ICE conduct its arrests as filmed spectacle, the requirement that produced the choreographed shows of force, the embedded private content creators, and the filmings for which everyone else present was threatened with arrest. And he did all of it while holding no federal office, drawing no federal pay, retaining undisclosed private economic interests, and exceeding, and concealing that he exceeded, the 130-day temporary designation that was the only federal employment he ever had during the period. He is therefore liable under 42 U.S.C. § 1985(3) as a private conspirator, and in the alternative as a federal employee-conspirator.

237. Notwithstanding those limits, Lewandowski functioned as the Department's de facto chief of staff: he held meetings in Defendant Noem's office in her absence, signed contract approval and policy change memoranda, placed federal employees on administrative leave, and sat in classified briefings. With Defendant Noem, he elevated Defendant Bovino to the command that ran the Chicago and then Minneapolis operations, and Defendant Bovino wrote in a contemporaneous email that he reported to Defendant Lewandowski rather than to Defendant Lyons. Lewandowski and Noem placed Bovino in charge of Operation Metro Surge with knowledge of the warnings from Defendant

Bovino's Los Angeles command, the racial-profiling complaints against him, and judicial findings that he had been "outright lying" about the use of force.

238. Defendant Lewandowski exercised authority over DHS during Operation Metro Surge that no law conferred on him. He was Defendant Noem's gatekeeper and her "shadow chief of staff," who exercised influence over DHS far beyond what the law authorizes a special government employee to do. A senior administration official described the division of labor: "Kristi is the face of DHS. Corey is the brains. He gets things done." He sought a Department of Homeland Security badge and a federally issued firearm, having no law enforcement training or background.

239. Defendant Lewandowski's federal status was part-time and temporary, and by its terms incapable of authorizing what he did. A special government employee may serve no more than 130 days in any 365-day period. 18 U.S.C. § 202(a). Defendant Lewandowski exceeded that limit and concealed the fact. In August 2025 the Department asserted publicly that he had worked sixty-nine days; four administration officials called that figure a gross undercount and reported that he entered federal buildings alongside other employees so as not to swipe his own badge and avoided government email and telephones so as not to create a record of his work. A White House official said: "We're hearing that Corey's doing everything — failing to swipe in, working from home, whatever — to undercount his days."

240. By January 2026, the month Renee was killed, Department sources reported that he had worked beyond the cap, all eight sources consulted by one publication described him as very involved in daily operations, and the Department would not say how many

days he had worked. Seven United States Senators have since written that "Congress set a maximum period of service of 130 days per year — a restriction Mr. Lewandowski appears to have violated."

241. Throughout that period he received no federal pay. Instead he retained and pursued his own economic interests, which he did not disclose. Ranking Members of three House committees found that he "has had ample opportunity to continue pursuing his business interests in the private sector while simultaneously playing a key role in awarding DHS contracts." Multiple Department contractors reported to White House officials that Defendant Lewandowski sought personal payment from them in exchange for favorable treatment of their Department contracts.

242. Plaintiffs allege that Defendant Lewandowski's conduct in furtherance of the conspiracy alleged in this Complaint was performed, in substantial part, apart from and in excess of the designation that was the sole source of his federal status, and after that designation had expired; that he did so for private purposes of his own that he was therefore acting as a private person during the entire course of Operation Metro Surge.

243. Defendant Bovino reported to Defendant Lewandowski. In a September 2025 email to Department leadership in Washington, sent while Defendant Bovino commanded the Chicago operation and three months before Operation Metro Surge, Defendant Bovino recounted a conversation with Defendant Lyons: "Mr. Lyons said he was in charge, and I corrected him saying I report to Corey Lewandowski." Defendant Bovino continued: "Mr. Lyons seemed intent that CBP conduct targeted operations for at least two weeks before transitioning to full scale immigration enforcement. I declined his

suggestion." The field commander of Operation Metro Surge understood himself to answer, on interior immigration enforcement, to a private civilian holding no federal office, and he invoked that understanding to refuse a directive from the Acting Director of ICE that would have substituted targeted enforcement for the full-scale street operations that killed Renee.

244. The demand that enforcement be produced as filmed content also came in part from Defendant Lewandowski. For months before Operation Metro Surge, he and Defendant Noem instructed that ICE record its arrests for social media, the more dramatic the footage the better, the policy under which the operation's choreographed shows of force and its embedded private content creators were produced.

245. Defendant Lewandowski participated in the decisions to launch, target, staff, command, and escalate Operation Metro Surge; possessed knowledge of the operation's discriminatory targeting of people of Somali and Hispanic origin and of the conduct of the agents carrying it out; possessed the practical authority to halt or alter it, having exercised authority repeatedly over the Department's personnel and operations; and did not do so. He stopped his involvement with the Department in March 2026, when Defendant Noem was removed as Secretary.

**D. Defendant Thomas D. Homan**

246. Defendant Homan is liable as a conspirator who joined, directed, and ratified the agreement with full knowledge of its object and its overt acts. He designed and publicly described the method by which the conspiracy would be executed (the city surge, the flooded zone, the stop premised on "physical appearance") before Minnesota was chosen.

He announced the escalation of federal enforcement in Minnesota on the day the President called Somali immigrants garbage. He thereafter, with full knowledge that the conspiracy was underway and of the conduct being carried out in its execution, took operational command of it, continued it, publicly defended the concealment of its agents' identities, characterized those who observed and objected to it as agitators, used its continuation to extract concessions from the State, and permitted it to run for another seventeen days before announcing its end.

247. Defendant Homan was the public architect of the 2025 campaign of city enforcement surges of which Operation Metro Surge was the largest, promising "shock and awe," vowing to "flood the zone in sanctuary cities," and announcing that the administration would "double down and triple down" on jurisdictions that resisted. On July 11, 2025, he publicly asserted that federal agents "don't need probable cause to walk up to somebody, briefly detain them, and question them," and may act on a person's "physical appearance." On December 2, 2025, he publicly announced that immigration enforcement activity in Minnesota would increase. On January 26, 2026, on the President's personal direction and immediately after the second fatal shooting of a United States citizen by federal agents in Minneapolis, he was dispatched to Minnesota and assumed operational command of Operation Metro Surge, displacing Defendant Bovino.

248. Defendant Homan is the administration's chief architect and public defender of the mass-deportation campaign of which Operation Metro Surge was the largest single component. He was dispatched to Minnesota by the President personally, and he reported

to the President and to the President's chief of staff rather than through the Department of Homeland Security's chain of command.

249. Defendant Homan knew precisely what lawful immigration enforcement looks like, because he had described it himself. In 2017, while serving as Acting Director of ICE, Defendant Homan explained that ICE conducts targeted immigration enforcement actions based on investigatory and intelligence work developing leads on where the agency may locate the target of an arrest, focused on specific individuals with a criminal history, and that ICE "do[es] not conduct neighborhood raids or sweeps; instead, our officers go to a specific location to locate a specific individual." Operation Metro Surge was an abandonment of that practice: roving patrols, general sweeps, and the interrogation of people encountered at random based solely on their race and ethnicity.

250. Defendant Homan designed and publicly announced these tactics. Before the administration took office, he promised "shock and awe." On July 7, 2025, he vowed that the administration would "double down and triple down in sanctuary cities" and would "flood the zone in sanctuary cities." On September 3, 2025, he told reporters at the White House, "We got 10,000 more agents coming on, we're going to flood the zone," and promised a ramp-up of operations. In November 2025, weeks before Minnesota, he announced the extension of the same model to Charlotte and New Orleans, saying that "you're going to see more operations in more major cities."

251. **July 11, 2025.** Defendant Homan publicly instructed the nation, and the agents under the campaign he directed, that federal immigration officers may stop and interrogate people on the basis of how they look. On Fox News, discussing the Los Angeles

operation then underway against that city's Latino population, he said: "People need to understand, ICE officers and Border Patrol, they don't need probable cause to walk up to somebody, briefly detain them, and question them," and identified the permissible bases as "their location, their occupation, their physical appearance, their actions." In Minnesota, a federal court found after an evidentiary hearing that this is what agents did: they stopped Somali and Hispanic individuals without reasonable suspicion while leaving similarly situated white individuals alone.

252. **December 2, 2025.** Defendant Homan told Fox News that there would be an increase in immigration enforcement activity in Minnesota, stating: "Yes, there's going to be an increase of activity up there. We're going to hold people accountable. We are going to enforce the laws of this country without apology." He made that announcement on the same day that the President, closing a televised Cabinet meeting, repeatedly described Somali immigrants as garbage he did not want in the country and applied the same epithet to Representative Ilhan Omar. Defendant Homan operationalized the President's rhetoric.

253. **January 26, 2026.** After federal agents shot and killed Alex Pretti, the second United States citizen killed by agents of this operation in seventeen days, the President personally directed that Defendant Homan be sent to Minnesota. The President told Governor Walz he was sending Defendant Homan; Defendant Bovino was stripped of his title and recalled; and the White House announced that Defendant Homan would assume command of Operation Metro Surge. Defendant Homan traveled to Minnesota on January 26, 2026, to take command of Operation Metro Surge, and that change in

leadership did nothing to alter the conduct of agents on the ground, who continued to attack, assault, threaten, and unlawfully arrest observers, journalists, and peaceful protesters.

254. **January 27, 2026.** Defendant Homan met with state officials for the first time, in the Governor's Cabinet room at the Minnesota Capitol, with the Governor, the Commissioner of Corrections, and the Superintendent of the Bureau of Criminal Apprehension present. He acknowledged that there had been missteps. When the Commissioner listed the ways in which Minnesota already cooperates with federal immigration enforcement, the Governor recalled Defendant Homan responding, "Oh, well, that's what we need."

255. **January 29, 2026.** At a press conference in Minneapolis, Defendant Homan described the federal agents deployed in Minnesota as personnel who "have been in theater eight months. Some of these people have been in theater eight months . . . . [T]hey've been in theater a long time." The word "theater" refers to a theater of war: Homan suggested that the tactics employed in Minnesota were the tactics of an occupying army rather than of federal law enforcement.

256. **February 4 and February 12, 2026.** Defendant Homan announced the withdrawal of 700 federal agents on February 4, 2026, and on February 12, 2026, he held a press conference announcing the effective end of Operation Metro Surge. At that press conference he described the overwhelmingly peaceful protesters and observers of Minnesota as agitators and announced that DHS would leave in place a small footprint of personnel together with a Customs and Border Protection Quick Response Force to respond when agitators got out of control.

257. **February 15, 2026.** Defendant Homan defended the concealment of federal agents' identities, the practice alleged above and the practice under which Renee Good was killed. He said: "I don't like the masks either," but "[t]hese men and women have to protect themselves," asserting increases in assaults and threats against ICE officers for which neither he nor his Department supplied a timeframe or a source. As to identification, he said only that agents "all have placards." He had defended the practice in the same terms throughout the preceding year, telling a July 2025 podcast that criticism of masked agents was unwarranted because assaults on ICE were up seven hundred percent.

258. Defendant Homan participated in the decisions to initiate, escalate, continue, and eventually terminate Operation Metro Surge; possessed knowledge of the operation's discriminatory targeting of people of Somali and Hispanic origin and of the conduct of the agents carrying it out; possessed the authority to halt it; and did not take any steps to do so until two United States citizens had been shot dead on the public streets of Minneapolis.

**E. Defendant Todd Lyons**

259. Defendant Lyons is liable as the conspirator who commanded the agency that executed the agreement in the streets. The components that carried out the operation's stops, seizures, raids, and detentions answered to him, including the special response team to which Defendant Ross was assigned. The arrest quotas and the instruction to agents to "turn up the creative knob up to 11" ran through his agency. He publicly promoted the operation as the largest immigration operation his agency had ever conducted while it was stopping people on Minneapolis streets because of how they looked. He knew from the Chicago command dispute that Defendant Bovino had rejected targeted enforcement in

favor of full-scale street operations and claimed to answer to authority outside the ordinary chain of command, and he sent him to Minneapolis anyway.

260. Lyons personally promoted the operation in allied media as the agency's "largest immigration operation ever." He received written notice on December 12, 2025, that agents under his command were engaged in racial profiling of Somali Minnesotans and were conducting enforcement in a manner that appeared "designed for social media." He took no corrective action: in the twenty-six days between then and the killing of Renee Good, the agency he commanded deployed thousands of additional agents to Minnesota, rescinded no concealment policy, imposed no identification or use-of-force corrective, disciplined no one, and escalated the discriminatory and violent street tactics he was aware of, while Defendant Lyons promoted the operation on national television. He, too, participated in Defendant Miller's daily operational calls.

261. Defendant Lyons commanded the ICE components, Enforcement and Removal Operations and Homeland Security Investigations, that executed the stops, seizures, raids, and detentions of Operation Metro Surge.

262. **January 5–6, 2026.** Defendant Lyons went on Newsmax to tout the crackdown as the agency's "largest immigration operation ever"; DHS amplified the interview on X on January 6, 2026, in a clip in which Defendant Lyons states, "We have the largest immigration operation ever taking place right now."

263. Defendant Lyons received Representative Omar's December 12, 2025 letter, jointly addressed to him and Defendant Noem. Representative Omar wrote that her constituents, advocates, and local officials had documented "blatant racial profiling," "an

egregious level of unnecessary force," and activity that appeared "designed for social media"; that "over 90% of Somalis in America are U.S. citizens, and we are not subject to immigration enforcement because we are citizens"; that "ICE officers have been stopping Black and Brown Minnesotans on the street or in public spaces at random, demanding to see their IDs"; that "[i]n some instances, that identification has not seemed to matter at all to officers, as multiple U.S. citizens have been arrested"; and that "one U.S. citizen was mocked for wearing a hijab and held in detention for 24 hours." Defendant Lyons continued and escalated the operation's targeting practices after receiving that notice: the deployment of approximately 2,100 additional agents beginning January 4, 2026, the January 6 proclamation of the largest operation in the agency's history, and the January 7 street deployment in the course of which Renee was killed all followed his receipt of the letter; and he never altered the operation's tactics, its concealment policies, or its integration of private media actors.

264. Defendant Lyons publicly characterized the operation as "intelligence-driven enforcement operations," a characterization irreconcilable with the district court's later finding of a policy of race-based stops without reasonable suspicion.

**F. Defendant Gregory Bovino**

265. Defendant Bovino is liable as the conspirator who commanded the operation in the field and performed it for the cameras. He had instructed agents to engage in racial profiling, a practice for which complaints had reached the Department before he was dispatched, and federal courts had already entered findings against the methods he used in Los Angeles and Chicago. As commander of Operation Metro Surge, he implemented the

roving patrols in which masked and unidentified agents surrounded a person on a public street. He conducted the operation as a filmed performance, which is what made the private conspirators' presence useful to it and its violence visible as a message to the targeted communities.

266. He had previously commanded the Los Angeles surge of June and July 2025 and the Chicago surge of September through December 2025, each directed at Latino neighborhoods, and it was during the Chicago surge that Shirley received his ICE ride-along; in Minnesota he and officers under his command staged highly choreographed and publicized shows of force. Asked at what number of apprehensions the surge would ease, he answered: "There is a number . . . and it's called all of them."

267. By the time of his Minnesota deployment, his methods were a matter of judicial record: in the Chicago operation he had commanded weeks earlier, a federal judge found that he had been "outright lying" about the use of force, including his own, and ordered him to wear a body camera and to ensure that agents under his command displayed visible identifiers; he had twice before been subject to court orders arising from racial profiling in operations he led. On information and belief, Defendants deployed him to Minneapolis not despite, but rather because of, this history.

268. Defendant Bovino was Operation Metro Surge's field commander and its chief performer. He was given command authority outside the ordinary chain of command; in Chicago, when Defendant Lyons told him that Lyons was in charge and urged two weeks of targeted operations before full-scale enforcement, Defendant Bovino wrote in a contemporaneous email that he "corrected him," that "i reported to Corey Lewandowski,"

and that he "declined his suggestion"; he presided in Chicago over the enforcement environment in which Shirley received his ICE ride-along and detainee interview; and in Minnesota he and officers under his command staged highly choreographed and publicized shows of force through parking lots, gas stations, and retail stores, spectacle produced in coordination with the embedded private content creators.

269. Defendant Bovino came to Minnesota directly from two operations conducted against Hispanic communities that deployed unlawful tactics. In June and July 2025, he directed "Operation At Large" in Southern California, in which officers targeted individuals based on their apparent race or ethnicity. Bovino personally led arrests at Home Depot parking lots and a show of force with mounted agents and armored vehicles through MacArthur Park in Los Angeles.

270. In September 2025 Defendant Bovino took the same operation to Chicago, announcing that he was "taking this show on the road, to a city near you" and trading "palm trees for some skyscrapers." The operation he commanded there, Operation Midway Blitz, was concentrated in Little Village and other Mexican-American neighborhoods. On November 20, 2025, sixteen days before Operation Metro Surge began, a federal judge entered a 233-page preliminary injunction finding that Defendant Bovino had been evasive and had engaged in "outright lying" across a three-day deposition; that he admitted he had lied about a rock striking him before he deployed tear gas in Little Village; that he falsely denied tackling a plaintiff and denied seeing a pepper-ball strike to a clergyman's head despite clear video; that agents' conduct shocked the conscience; that body-camera footage contradicted official reports, rendering them, in the court's words, "simply not credible";

and that Defendant Bovino had falsely claimed that maroon hoodies signified gang membership.[8] The court ordered agents to wear and activate body-worn cameras, and had earlier ordered Defendant Bovino himself to appear in court every weekday. Defendants Noem and Lyons deployed him to command the Minnesota operation anyway.

271. DHS received complaints that Defendant Bovino instructed agents to engage in racial profiling, and that during his time in Los Angeles he was warned that his tactics could result in fatalities.

272. Defendant Bovino publicly asserted an unbounded stop authority: "I can question anyone anywhere in the United States as to their citizenship . . . and our agents are trained to do that." That assertion is contrary to 8 U.S.C. § 1357(a), which authorizes interrogation only of "any alien or person believed to be an alien" as to his right to be or remain in the United States.

273. Hours after Renee was killed, Defendant Bovino publicly defended the shooting, stating that the officer "had no clue that that was going to happen, but he was put into that violent situation and reacted when a 4,000-pound missile came right at him." After the killing of Alex Pretti, Bovino blamed the death on local officials, applauded the actions of the agents on CNN, and described the agents as victims.

274. On January 17, 2026, one day after a federal judge barred the use of chemical irritants against peaceful protesters and observers, Defendant Bovino publicly vowed on Fox News that agents would continue deploying tear gas. On January 21, 2026, Bovino

[8] Memorandum Opinion and Order Granting Preliminary Injunction, *Chicago Headline Club v. Noem*, Doc 281, No. 1:25-cv-12173 (N.D. Ill. Nov. 20, 2025) (Ellis, J.).

was recorded throwing a gas canister into Mueller Park in Minneapolis, announcing "Third warning. Gas, gas, gas" before deploying the canister as people fled.

275. Defendant Bovino departed the Minneapolis operation on or about January 26, 2026, in what CNN reported was a mutual decision, after DHS suspended his access to his own social-media accounts following his online exchanges with elected officials about the Pretti killing; he was removed from his position and left Minnesota.

276. Defendant Bovino's underlying ideology surfaced publicly after he left the Border Patrol: in 2026 he endorsed remigration, the mass-removal concept promoted at a European white-nationalist conference he lent his name to. Defendant Bovino held and acted upon that mass-removal ideology while commanding Operation Metro Surge against Minnesota's Somali and Hispanic communities. In November 2025 he had posted a video showing masked agents conducting raids, captioned: "Masked up, mission ready. 'It's not who I am underneath, but what I do that defines me.'"

**G. Defendant Jonathan Ross**

277. Defendant Ross is liable as the conspirator who carried out the agreement's object on the ground and killed Renee in the process. He went out on January 7, 2026, masked, in unmarked vehicles with concealed plates, without a name, badge number, or other individual identifier, in conformity with the policies the operation's architects had established. He and the agents with him roved a residential street in a neighborhood selected for its Somali and Hispanic population, stopped where they chose, and seized people who appeared Somali or Hispanic without regard to citizenship or immigration status, and accosted and assaulted civilians, like Renee, who tried monitor the agents,

protest their actions, or alert their neighbors to the agents' presence. When Renee stopped her car and sounded her horn to alert her neighbors to his presence, he approached her, filmed her, and ultimately repeatedly fired at her without justification. An agent who executes a conspiracy's object by taking to the streets in furtherance of it, deploying its core tactics, and then killing a person engaged in observing it has joined the conspiracy and is liable for its injuries.

**H. The John Doe Federal Agents**

278. The John Doe Federal Agents are liable as the conspirators who executed the agreement's object alongside Defendant Ross. Each was deployed for Operation Metro Surge; each went in disguise on the public streets, masked and without individual identification, in conformity with the operation's policies; each participated in the unlawful stop and confinement of Renee Good in her vehicle; each stood by while she was shot; and each then refused her medical aid and drove other people away from her, including a physician who identified himself and offered to help. Each thereby participated in the operation's pattern of race-based stops and seizures and in the specific acts that killed her.

**I. Private Co-Conspirators**

279. The participants in the conspiracy were not limited to the Defendants named in this action. Among the private persons who agreed to and in fact participated in the conspiracy to deprive people of Somali descent and origin of the equal protection of the laws were Shirley, Rufo, and Bergquam, whose involvement is pleaded above.

280. At least two private corporations also agreed to and in fact participated in the conspiracy: Palantir Technologies Inc., the Delaware corporation that designed, built,

configured, and maintained the targeting application by which the operation's agents were directed to the neighborhoods they invaded, and Clearview AI, Inc., the Delaware corporation whose facial recognition search engine the operation used to identify the people who observed, filmed, and protested the operation.

281. Palantir Technologies Inc. ("Palantir") agreed to and participated in the conspiracy as the corporation that built and operated the machinery used by ICE to decide which areas to target for its unlawful operations. Palantir acted with knowledge that the operation it was equipping had been conceived to target people of Somali descent and origin and Hispanic people from Minnesota as a class. Because it continued to collaborate with ICE long after it became clear ICE was deploying agents to targeted neighborhoods to detain and arrest individuals based solely on apparent ethnicity, Palantir acted with the purpose that its instrument be used to accomplish that object.

282. In September 2025, three months before Operation Metro Surge began, Palantir entered a supplemental agreement valued at approximately $29.9 million to provide "configuration and engineering services" for a program that Palantir had developed and provided to ICE called ELITE. That agreement ran for at least one year and was therefore in force through every day of the operation. Palantir was thus not a seller who had delivered a product and moved on. It was under a continuing engineering engagement to configure and refine the targeting application while that application was being used against people of Somali and Hispanic descent in Minnesota.

283. ELITE stands for Enhanced Leads Identification and Targeting for Enforcement. Palantir built ELITE and describes it in its user guide as "a targeting tool

designed to improve capabilities for identifying and prioritizing high-value targets through advanced analytics." The design objective Palantir wrote for its own product describes an instrument that carries the government from suspicion to arrest: from "identifying subjects in the first place, to building a list of people, to supervisors approving selections for officers to ultimately go into the field and apprehend" them.

284. ELITE displays a map of the United States on which an officer may select subjects individually or by drawing a shape around an area; it reports how many people with an "immigration nexus," defined as anyone who has had contact with an immigration agency, are present within that area; it permits bulk lookups; and it assigns each subject an address confidence score from zero to one hundred, computed by Palantir from the accuracy and recency of the underlying data and displayed beside the person's name, photograph, Alien Registration Number, and date of birth.

285. In reality, ELITE was used not simply to identify individual residences, but to identify entire neighborhoods for ICE to target. Agents have described under oath how they used ELITE. In a deposition in a federal action in Oregon, an ICE Fugitive Operations officer testified that ELITE "is basically a map of the United States. It's kind of like Google Maps." The same officer testified that the scores determine where agents go: "You're going to go to a more dense population rather than, like, if there's one pin at a house and the likelihood of them actually living there is like 10 percent, you're not going to go there." He also testified that the number Palantir supplies is frequently wrong: "The app could say 100%, and it's wrong. The person doesn't live there." ELITE told ICE agents where they should concentrate their activities.

286. Palantir knew what Operation Metro Surge was and continued to provide the systems that ICE used to target and harass Somali and Hispanic Minnesotans. In January 2026, while Operation Metro Surge was still running, Palantir's own civil liberties team updated an internal wiki that acknowledged the widespread reports that ICE was racially profiling and deporting citizens, and defended the partnership notwithstanding. A corporation that records in its own internal guidance that its customer is racially profiling and deporting citizens, and then continues to configure that customer's targeting application, has not been deceived about the enterprise it is serving.

287. Palantir's own employees told it the same thing in real time. After federal agents shot and killed Alex Pretti, Palantir employees wrote in a company-wide channel: "In my opinion ICE are the bad guys. I am not proud that the company I enjoy so much working for is part of this"; "We need an understanding of our involvement here"; and "Can Palantir put any pressure on ICE at all?" Employees asked directly, of the Minneapolis killings, "Were we involved, and are doing anything to stop a repeat if we were?" A former employee said: "We were supposed to be the ones who were preventing a lot of these abuses. We seem to be enabling them." A Palantir executive answered that the company does not "take the position of policing the use of our platform for every workflow," attributing the concerns to "bad apples."

288. Clearview AI, Inc. ("Clearview") agreed to and participated in the conspiracy as the corporation that identified the conspiracy's critics so that they could be silenced. One core function of the agreement was the suppression of observation of the operation,

and Clearview supplied the means of unmasking observers: a search engine that converts a photograph of a face taken on a public street into a name, a history, and a dossier.

289. Homeland Security Investigations used Clearview AI's services during Operation Metro Surge to build photographic files on people protesting its operations, including on people whose only activity was standing outside a federal building watching ICE vehicles come and go. Clearview logged each of those searches, recorded the case number and crime type asserted for each, and permitted them to continue. It has never denied the use, never suspended it, and never disclaimed it, and it took new federal targeting work in the weeks after the operation killed Renee and Alex Pretti. Upon information and belief, Clearview acted with knowledge that its system was being used to identify and intimidate the people who observed and objected to a campaign of ethnic removal, and with the purpose that it be so used.

290. Clearview sells the ability to take a photograph of a human face and learn who that person is, where else that person has appeared, and what that person has been doing, by matching the face against more than seventy billion images scraped from the internet. On September 5, 2025, ICE awarded Clearview a sole-source contract with a ceiling of $9,225,000 and a period running to September 4, 2026. The award's stated purpose was narrow: it "procures facial recognition software, which supports Homeland Security Investigations with capabilities of identifying victims and offenders in child sexual exploitation cases and assaults against law enforcement officers." What HSI did with the software in Minneapolis bore no relation to that scope.

291. During Operation Metro Surge, Homeland Security investigators fed photographs of individuals observing or protesting ICE activity into Clearview, which yielded historical images that were folded into composite intelligence files that combined the facial recognition returns with vehicle records, social media, and other investigative material.

292. The people Clearview's system was used against were, by the government's own records, people who were lawfully observing ICE activity. Undercover HSI agents posing as protesters or activists surveilled community meetings at churches, parks, libraries, union halls, schools and restaurants, secretly recorded those meetings, and actively participated in organizing and directing the groups they were surveilling, at times working to entice people into discussing or committing crimes. Agents routinely surveilled individuals engaged solely in First Amendment protected activity, including the Whipple Watch group that engaged in peaceful observation of ICE vehicle activity in and out of the Whipple Building. Federal agents fed the images of lawful observers, critics, and protestors that they obtained into Clearview's system to gain information they would use to suppress dissent. Agents subsequently deployed the information they received to track, target, and harass individuals engaged in protected First Amendment activity.

293. Clearview knew, in the ordinary course of its own business, exactly what its product was being used for in Minneapolis. Clearview advertises to federal customers that a "CASE NUMBER & CRIME TYPE REQUIRED BEFORE SEARCH," and states that "[e]very search is permanently logged with user identity, timestamp, and case information." Clearview therefore holds, in its own records, the identity of every agent who

ran a Metro Surge search, the date of every search, and the crime type each agent asserted to justify searching the face of a person who was standing on a sidewalk watching. Upon information and belief, those records will show that searches were run against observers and protesters under case numbers and crime types that no honest reading of the contract's scope would support, and that Clearview permitted them.

294. Clearview has never denied the way federal agents used its tools in Minneapolis. Clearview never suspended DHS's use of its tools and never disclaimed those uses. In February 2026, when national reporting described agents scanning faces on Minneapolis streets, Clearview did not respond to a request for comment; and in August 2026, when additional information about Clearview's involvement in Metro Surge became public, Clearview did not respond to questions. On August 11, 2026, its Chief Executive Officer said instead: "Sustained growth at this scale reflects the trust that law enforcement and government agencies place in our technology every day."

295. Clearview, like Palantir, entered into new, lucrative agreements with the government even after it was on notice of DHS's uses of its products. Within weeks of the killings of Renee and Alex Pretti, U.S. Customs and Border Protection awarded Clearview a new contract for fifteen licenses at the National Targeting Center, for "tactical targeting" and "counter-network analysis."

296. Both these corporations had knowledge of the enterprise's object at the time it performed. The object was public: the President had said what he wanted done to Minnesota's Somali community, the government had operationalized the President's animus, and by January 2026 a federal court and the national press had documented the

operation's class-based stops and harassment. Palantir documented the profiling in its own internal guidance and continued. Clearview watched its product be used on the people who observed the operation, and continued. Each thereby adopted the purpose of the enterprise it was serving.

297. The relationship between these corporations and the federal Defendants was not the arm's-length relationship of buyer and seller. ICE certified to the government's contracting authorities that Palantir was "the only source" that could supply what the campaign required, and awarded sole-source contracts on that basis for more than a decade. Clearview's ICE award was likewise sole-source. An entity that the government has certified to be irreplaceable, engaged without competition, and integrated into the daily conduct of an operation is a participant in that operation, especially when they continue their active participation in the operation even after its unlawful and discriminatory character becomes apparent.

## VI. RENEE'S KILLING OCCURRED IN THE COURSE OF AND IN FURTHERANCE OF OPERATION METRO SURGE

298. Defendant Ross was in south Minneapolis on January 7, 2026, as a participant in Operation Metro Surge. Renee and Becca Good encountered Immigration and Customs Enforcement agents who were part of that operation. Ross was, upon information and belief, a member of the ICE Enforcement and Removal Operations special response team, deployed in Minnesota under the command of Defendants Lyons and Bovino as part of the operation.

299. The killing occurred at the operation's peak. On or about January 5, 2026, the administration announced the deployment of approximately 2,000 to 2,100 additional agents, and DHS stated that they would focus on fraud investigations in the wake of Shirley's video. On January 6, 2026, DHS proclaimed "GOOD MORNING MINNEAPOLIS!" and Defendant Lyons declared, "We have the largest immigration operation ever taking place right now." On January 8, 2026, the day after the killing, the administration deployed more than one hundred additional CBP agents to Minnesota from operations in Chicago and New Orleans.

300. The conduct that killed Renee Good followed the operation's standard operating procedure. Federal agents in unmarked vehicles, concealing their identities, stopped a civilian vehicle on a public street; refused to go around it; commanded the occupant out of the car without any lawful basis; attempted to open her door and reached inside her window; positioned an agent in front of her vehicle; and used force when she attempted to leave. Judge Tostrud found the identical pattern across two dozen encounters: agents "approached people on the street, or pulled them over in their vehicles, and requested identification without any explanation for why the stop occurred and often without identifying themselves."[9] Judge Menendez found an "ongoing, sustained pattern

[9] Findings of Fact, Conclusions of Law, and Order, *Hussen v. Noem*, No. 0:26-cv-00324-ECT-ECW (D. Minn. Mar. 9, 2026) (Tostrud, J.), at 85.

of conduct" of federal officers "initiating traffic stops of anyone they suspect to be following them."[10]

301. The conduct of Ross and the other agents present during the killing violated the Constitution and mandatory rules of the Department of Homeland Security. The flagrant violation of legal and constitutional rights, however, was a feature of the conspiracy alleged in this complaint. The defendants caused the agents on the ground to be led to believe that there would be impunity for the violation of laws, rules, and regulations occurring during defendants' coordinated campaign to terrorize Somali and Hispanic Minnesotans and those who would not look away. The agents on the ground conducted themselves accordingly.

302. Renee was killed for the very activity the operation was designed to suppress. Renee was stopped and targeted for engaging in constitutionally protected observation of immigration enforcement. She had stopped in the street and honked her horn to warn her neighbors that masked federal agents were in the neighborhood, as was her right under the First Amendment. Her partner had gotten out to film. Federal agents deliberately targeted and punished this sort of conduct throughout the operation, and a federal court preliminarily enjoined it.[11]

---

[10] Order Granting in Part Motion for Preliminary Injunction, *Tincher v. Mullin*, No. 0:25-cv-04669-KMM-DTS (D. Minn. Jan. 16, 2026) (Menendez, J.), at 46, stayed pending appeal, No. 26-1105 (8th Cir. Jan. 26, 2026).

[11] Order Granting in Part Motion for Preliminary Injunction, *Tincher v. Mullin*, No. 0:25-cv-04669-KMM-DTS (D. Minn. Jan. 16, 2026) (Menendez, J.), stayed pending appeal, No. 26-1105 (8th Cir. Jan. 26, 2026). For further examples of federal agents targeting, harassing, and punishing lawful observers during Operation Metro Surge, *see* First Amended Complaint, ECF 136, *Tincher v. Mullin*, Case No. 25-cv-04669

303. Defendants then used Renee's death to further the conspiracy's *in terrorem* purpose. On January 11, 2026, four days after the killing, federal agents threatened a legal observer, telling him to go home, not to "make a bad decision," and demanding: "You did not learn from what just happened?" Another agent asked an observer, "Have y'all not learned your lesson?" She understood the question as a reference to the killing of Renee Good, and, when she asked what lesson she was supposed to have learned, the agent answered, "Following federal agents," and grabbed her phone.

304. The message was received by exactly the targets at which it was aimed. The killings of Renee and Alex Pretti heightened fear and sent a clear message to Minnesota residents that objecting to the federal government's unlawful and discriminatory campaign could cost them their lives. One resident asked: "If Renee and Alex were killed, then who wouldn't be killed?" An observer confronted by agents on either side of her car said: "I had agents on either side, I was thinking, this is exactly how Renee Good was killed." A teacher who drove past an arrest said that he thought about stopping but had just seen the video of Renee Good's killing: "I just thought I should shut up and drive."

305. The injury fell disproportionately on the communities the conspiracy targeted. The day after Renee Good was killed, one Minneapolis physician reported that nine of twenty-five patients missed their appointments, and that they were mostly Hispanic

---

(KMM/DTS) (D. Minn., filed February 13, 2026); Declarations, ECF 1-1 through 1-13, 33-37, 58-69, 97-99, 102, 106-109, 136-1 through 136-83, 140-144, 146-175, 177-229, 232, 295-296, 298-301, 303-304, 306-307, 309-318, *Tincher v. Mullin*, Case No. 25-cv-04669 (KMM/DTS) (describing ICE and CBP misconduct toward legal observers during Operation Metro Surge).

or Somali. An emergency provider reported that patient visits dropped by approximately fifty percent after her killing. Somali and Latino students stayed home from school in large numbers.

306. The conspiracy's federal participants moved to protect the shooter within hours. Defendant Noem declared that Renee engaged in "an act of domestic terrorism" before any investigation existed; Defendant Bovino publicly defended the shooting the same day and described the agents as victims; the Vice President declared the shooter immune; and the Department of Justice announced that it would not investigate Ross or the other agents at the scene at all.

307. The shooting of Renee Good was an overt act in furtherance of the conspiracy alleged in this Complaint: it occurred in the execution of Operation Metro Surge; it was carried out by an agent deployed for that operation, employing the operation's characteristic tactics of concealment and roadway confrontation; it silenced a person engaged in alerting her neighbors to the operation; it was ratified within hours by the operation's most senior architects; and her death was deliberately deployed to intimidate anyone else who might speak up.

308. Suppression of observation was a core part of the conspiracy. The operation granted a filming monopoly to its allied propagandists while everyone else present was threatened with arrest for the same conduct; its Field Office Director explained on the air that the access existed so that "people like Ben [Bergquam] out here tell our story"; its internal communications revealed a plan to trade exclusive access for favorable coverage; and its embedded propagandists suppressed the footage that did not serve the story. What

could not be controlled by exclusive access was to be controlled by force: agents threatened bystanders with arrest for recording, and, after January 7, told observers "You did not learn from what just happened?" and asked whether they had "not learned your lesson."

309. Renee was killed in the course of conduct that served both of those objects. She was a neighbor and ally of the targeted classes engaged in observing and warning, the precise conduct the operation had set out to suppress by monopoly, by threats, and by ordered confrontation. The confrontation on Portland Avenue was the operation's *modus operandi*: the roadway stop by masked agents, the boxing-in, the demand for compliance without lawful basis, the resort to grossly excessive force, deployed against Renee because she was warning her neighbors.

## CLAIMS FOR RELIEF

## COUNT I

### 42 U.S.C. § 1985(3), Conspiracy to Deprive Persons of Somali Descent and Origin and Hispanic Persons of the Equal Protection of the Laws

**(Both Plaintiffs Against All Defendants)**

310. Plaintiffs incorporate by reference each of the foregoing paragraphs.

311. Section 1985(3) makes it unlawful for "two or more persons in any State or Territory [to] conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." The statute reaches conspiracies at least including conspiracies between private persons and government officers.

312. President Trump and Defendants Miller, Noem, Lewandowski, Lyons, Homan, Bovino, Ross, and the John Doe Federal Agents, together with co-conspirators Shirley, Rufo, Bergquam, Palantir Technologies Inc., and Clearview AI, Inc., entered into and carried out (along with countless other public and private conspirators) an agreement to conduct and escalate Operation Metro Surge, whose object was to deprive people of Somali descent and origin and Hispanic people in Minnesota of the equal protection of the laws. As a means to achieve the conspiracy's object, the conspirators agreed to and worked to suppress, by exclusive-access arrangements, intimidation, arrest, and force, the observation, documentation, warning, and community defense of the targeted classes by their neighbors and allies.

313. Suppression of observation, documentation, warning, and protest was a core part of the means through which Operation Metro Surge sought to achieve its unlawful, discriminatory objective, as evidenced by, at a minimum: the grant of a filming monopoly to embedded propagandists while all others present were threatened with arrest for filming; ICE Field Office Director Bradford's on-air explanation that the access existed so that "people like Ben [Bergquam] out here tell our story"; the internal ICE communications trading exclusive access for favorable coverage; Bergquam and other propagandists' suppression of the footage that did not serve the narrative; Defendant Miller's orders, on the operation's daily command calls, that agents be dispatched to areas of Minneapolis where observers and protesters were concentrated to "force confrontations" with them; and the agents' own statements to observers after Renee's killing: "You did not learn from what just happened?" and "Have y'all not learned your lesson?" A conspiracy that decides who

may observe it, arrests those who observe without permission, and dispatches its agents to force confrontations with observers has made the control and suppression of observation a core function of the conspiracy.

314. The conspiracy was not the internal affair of any single entity. Its participants spanned the White House (including President Trump and Defendant Miller); the office of the border czar (including Defendant Homan); the Homeland Security Secretary's private adviser (Defendant Lewandowski, whose federal status was a temporary 130-day designation that had expired by the time Operation Metro Surge began and who was otherwise a private consultant free to take private pay); the Department of Homeland Security and its separate components ICE and CBP (including Defendants Noem, Lyons, Bovino, Ross, and the John Doe Federal Agents); at least two private corporations; and private persons and for-profit enterprises (including co-conspirators Shirley, Rufo, and Bergquam). No intracorporate character can be ascribed to an agreement among the these government and private actors.

315. The agreement is established by, among other things: the pre-existing and continuing operational relationships between the federal participants and the private ones; the joint manufacture and federal adoption of the operation's predicate, in which the private participants fabricated ethnically framed accusations against the Somali community as a whole and the federal participants responding with a massive, violent, and discriminatory show of force; the division of labor by which each participant supplied what the others could not, including Palantir building and continuously configuring the application that told agents which doors to approach, Clearview supplying the engine that identified the

people who watched and filmed; the private media participants supplying the accusations and an audience for the federal participants' brutality and serial violation of rights on the basis of race, ethnicity, and national origin; the integration of private participants into the operation itself, including their transport in federal enforcement vehicles during race-based street stops, the grant to them of filming privileges denied to everyone else on pain of arrest; the exchange of value running in both directions, with access, official amplification, protection, and proposed congressional honors flowing to the private participants and content, targeting, and political cover flowing back to the government; and the decision of every participant to continue and expand its role after the operation's discriminatory object had been stated by the President, and after it became evident that the operation in fact unlawfully targeted Hispanic Minnesotans and Minnesotans of Somali origin and descent.

316. The conspiracy was motivated by invidious, class-based animus against people of Somali descent and origin and against people of Hispanic descent and origin. That animus was expressed, repeatedly and publicly, by the President, Defendants Miller, Rufo, Shirley, and Bergquam, in the statements set out above, including that Somalis are "garbage" who "come from hell," whose "country stinks," and who should be sent "back to where they came from"; that "the Somali refugee experiment in our country has failed"; that Somali Americans exhibit "persistent issues in every subsequent generation"; that Mexican immigrants are "bringing drugs," "bringing crime," and are "rapists"; and that immigrants are "poisoning the blood of our country." The conspirators acted as they did because of the conduct's adverse effects upon people of Somali origin and upon Hispanics, and not merely in spite of them: the classes were the operation's announced predicate, its

target-selection criterion, its measure of success, and the intended audience of its intimidation.

317. The conspiracy's purpose was set at the top and adopted by everyone who joined it. Operation Metro Surge was conceived, ordered, and carried out to satisfy the animus toward people of Somali descent and origin that the President and Defendant Miller repeatedly expressed, and the animus toward Hispanic people that the President and Defendant Miller had harbored and expressed for years. The White House said as much in its own releases, crediting the operation to the President and describing its object as "the Somali-dominated scams that have bled taxpayers dry."

318. Defendant Miller converted the President's animus into operational orders on daily calls conducted with what participants understood to be the President's own authority. Each Defendant who designed, commanded, staffed, executed, or joined that operation acted for the purpose that defined it. Each conspirator willfully participated in Operation Surge knowing what it was designed to accomplish, and knowing that it in fact was causing *en masse* violations of the rights of Somali and Hispanic Minnesotans.

319. People of Somali descent and origin and Hispanic people are each a protected class within the meaning of § 1985(3). The animus alleged here ran to Somali national origin and ethnicity as such, and to Hispanic ethnicity as such, and not to immigration status: the operation's targets included natural-born and naturalized United States citizens and lawful permanent residents of both classes; both classes are overwhelmingly composed of United States citizens and lawful permanent residents; Defendants' own statements ascribed defect to the natural-born American citizen children of Somali immigrants; and a

federal court found after an evidentiary hearing that agents "stopped Somali and Hispanic individuals without reasonable suspicion while they did not stop similarly situated nearby white individuals."

320. The conspiracy's object was the deprivation of the equal protection of the laws, and it accomplished that object. In accordance with the animus that gave rise to it, Operation Metro Surge in fact disproportionately and unlawfully targeted people of Somali origin and descent and Hispanic people. The operation defined its targets by ethnicity from the outset: the group-wide revocation of Temporary Protected Status for every Somali national in the United States; the adoption of a privately manufactured list of Somali-run facilities as the predicate for door-to-door enforcement; and the government's own tally of its criminal defendants by Somali descent. Its agents concentrated their patrols in Somali and Latino neighborhoods, including Cedar-Riverside, Karmel Mall, the Lake Street corridor, and the West Side of Saint Paul, and stopped, interrogated, seized, and arrested the residents of those neighborhoods because of how they looked, irrespective of citizenship or immigration status, while leaving similarly situated white individuals alone. The stops swept up the United States citizens and lawful permanent residents identified above; Minneapolis residents of color were seventy-three percent more likely to be disbelieved about their lawful status after demonstrating it; and a federal court found, after an evidentiary hearing, that Defendants adopted a policy authorizing investigatory stops based on ethnicity or race without reasonable suspicion, that the only salient factor in the documented encounters was the individual's race or ethnicity, and that the stops became de facto arrests.

321. The operation simultaneously stripped the targeted communities of the ordinary protections of the law: its agents concealed their faces and their license plates in violation of Minnesota criminal law, depriving victims and witnesses of the ability to identify who had violated their rights, and the federal government then obstructed the state investigations that followed. The outcomes confirmed the design: though Somali Minnesotans were serially targeted, harassed, stopped, and detained during Operation Metro Surge, of the thousands of people formally arrested for immigration violations, fewer than three percent were Somali, while Ecuador accounted for 1,026 arrests and Mexico for 885; nearly two out of three of those arrested had no prior criminal history; approximately 1,300 were collateral arrests of people who were not the target of any operation; only two people were ultimately deported to Somalia; and the targeted communities suffered the group-wide injury the operation's architects intended, in shuttered businesses, children kept home from school, missed medical appointments, and United States citizens carrying their passports wherever they went.

322. Defendants and their co-conspirators committed numerous overt acts in furtherance of the conspiracy, including without limitation: the publication and federal adoption of the fabricated terror-financing and day care accusations; the launch, staffing, escalation, and command of Operation Metro Surge; the adoption and maintenance of the illegal policies regarding masking, concealment of license plates, and roving patrols; the conduct and direction of thousands of race-based stops, seizures, and arrests of people of Somali and Latin American descent, including United States citizens; designing, configuring, and maintaining the application that directed the operation's agents to the

neighborhoods and addresses they entered; operating the facial recognition system by which the operation identified the people who observed and filmed it; targeting and harassing individuals who observed and protested the operation, and the direction thereof; the embedding of private conspirators in enforcement operations; the dispatch of agents to areas of Minneapolis where observers and protesters were concentrated, with orders to force confrontations with them; the killings of Renee and Alex Pretti; and the threats made to observers of the operation in the days after Renee's killing.

323. The killing of Renee was an act in furtherance of the conspiracy. She was killed in the course of Operation Metro Surge, by an agent deployed for that operation, employing that operation's characteristic tactics, while she was engaged in observing and alerting people to that operation in her own neighborhood. Her killing was immediately ratified and defended by the conspiracy's most senior federal participants, was used by federal agents participating in the conspiracy to threaten other Minnesotans who observed the operation, and was celebrated by the conspiracy's private participants. The fear this caused for the targeted communities and their allies was more than an effect the conspirators foresaw. It was an object they pursued, before the killing, by exclusive access, threats, and ordered confrontation, and after it, by ratifying the shooting and invoking it to warn others.

324. Section 1985(3) affords its remedy to the "party so injured or deprived": whenever conspirators do or cause to be done "any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property," the injured person "may have an action for the recovery of damages occasioned by such injury or deprivation,

against any one or more of the conspirators." 42 U.S.C. § 1985(3). The remedial clause runs to persons injured by acts in furtherance of the conspiracy; it does not confine recovery to members of the class whose equal protection the conspiracy targets. It was written for a time when those who stood with the freedmen (teachers, registrars, organizers, neighbors) were beaten and killed for doing so, and it reached their cases.

325. Renee was injured by acts in furtherance of the conspiracy's objects. One of those objects was the intimidation and suppression of the observation, documentation, warning, and community defense of the targeted classes. At the moment she was confronted and killed, she was engaged in that conduct: she had stopped her car and was honking her horn to warn her Somali and Latino neighbors that masked federal agents were operating on their block, while her partner stood in the street and filmed.

326. Renee was injured in her person and property by the acts done in furtherance of the conspiracy. She was unlawfully confined, shot three times, denied medical aid, and killed. She suffered severe conscious physical and emotional pain and suffering and a total loss of the enjoyment of life. Her next of kin have suffered and will continue to suffer pecuniary loss, including the loss of her economic support, services, advice, counsel, comfort, assistance, protection, and companionship.

327. Renee was thirty-seven years old at the time of her death. She was a loving and devoted mother to her three children. She had primary custody of her son E.M., age six, for whom she provided daily care and support, and for whom she would have continued to provide economic and emotional support, advice, services (including all of the responsibilities associated with raising a child), comfort, assistance, and protection for

decades to come. She served on the school board at E.M.'s school and had recently applied to work there as a substitute teacher.

328. Renee had primary care of her two older children, S.S. (age fifteen) and R.S. (age twelve), during the summers and on alternating holidays, and she provided care and support to them year-round. During the summers, Renee would take her children to zoos, museums, and restaurants — she would spend time with her children exploring anything in which they were interested, and she always prioritized their enrichment and growth with whatever resources were available to her. She would have continued to provide economic and emotional support, advice, services, comfort, assistance, and protection to S.S. and R.S. for decades to come.

329. Renee had strong relationships with her parents and with each of her siblings. Before moving to Minneapolis, she lived near her parents and sister in the Kansas City area, and she remained close to her family after she moved: she spoke and texted with her parents and siblings regularly, traveled to see family members multiple times a year even when money was tight, and usually spent Christmas in Kansas City with her children, parents, siblings, and their families. She was a devoted aunt to her nieces and nephews. Typifying her relationships with her siblings, Renee officiated Brent's wedding, and Brent officiated hers.

330. Renee was a voracious reader with an amazing singing voice who loved film and animals. She had previously worked as a substitute teacher and as a bank teller, was preparing to pursue a master's degree in English, and was the primary provider and source

of income for E.M., and for S.S. and R.S. during the periods when she was their primary caretaker.

331. A person injured by acts done in furtherance of a § 1985(3) conspiracy "may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators," 42 U.S.C. § 1985(3), and each conspirator is jointly and severally liable for the injuries caused by the conspiracy's overt acts.

332. Plaintiff Rebecca Good was also injured in her person by acts done in furtherance of the conspiracy's objects. One of those objects was the suppression of the observation, documentation, and warning that the targeted communities and their neighbors used to defend themselves. Becca Good was engaged in exactly that conduct when the agents confronted her and her partner: she had stepped out of the car and was filming them. The agents' response was to confine Renee in the vehicle, to order her out of it, and then to shoot her to death a few feet from where Becca stood. Becca was placed in physical danger by the gunfire, was made to witness the killing of her partner, and has suffered the severe and lasting emotional and physical injuries pleaded above. She is a party injured within the meaning of 42 U.S.C. § 1985(3) and may recover her own damages.

333. Defendants acted maliciously, willfully, wantonly, and in reckless disregard of Renee Good and Becca Good's federally protected rights, warranting punitive damages.

## COUNT II

### 42 U.S.C. § 1985(3), Going in Disguise on the Highway for the Purpose of Depriving Persons of Somali Origin and Hispanic Persons of the Equal Protection of the Laws

### (Both Plaintiffs Against Defendants Ross and the John Doe Federal Agents)

334. Plaintiffs incorporate by reference each of the foregoing paragraphs.

335. The second clause of § 1985(3) reaches circumstances in which "two or more persons . . . go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." Congress wrote that clause in 1871 to reach exactly what it describes: bands of men who concealed their identities and rode the public roads to strip a hated class of the law's protection.

336. Defendant Ross and the John Doe Federal Agents were two or more persons who went in disguise on the public highways and streets of Minneapolis, Minnesota. As alleged above, and as contemporaneous video of the encounter shows, they concealed their faces with masks or other face coverings; they wore no name, badge number, or other individual identification; they did not identify themselves; and they traveled in unmarked vehicles bearing license plates that were unregistered in Minnesota, switched between vehicles, falsified, obscured, or absent. Their concealment was deliberate. It was carried out for the purpose of preventing identification, and which violates Minn. Stat. § 609.735, a generally applicable Minnesota criminal statute containing no law enforcement exemption. Defendant Ross's own vehicle bore a plate not registered with the State of Minnesota. The FBI itself warned DHS that the practice made its agents indistinguishable

from the masked criminals then committing kidnappings and attempted rapes in immigration officers' names.

337. They went in disguise **on the highway**. Renee Good was killed in her car on a public street, Portland Avenue between 33rd and 34th Streets in Minneapolis. Defendant Ross and the John Doe Agents were traveling that public roadway in vehicles, in disguise, when they encountered her; they stopped their vehicles in the roadway; they surrounded her car in the roadway; and they shot her in the roadway. More broadly, the disguised movement of these Defendants and their fellow agents along the public streets and highways of the Twin Cities was the operation's principal method: agents in unmarked vehicles roved the public ways, boxed in and stopped civilian vehicles, blocked roads, and demanded that people prove their citizenship on the roadside.

338. They went in disguise on the highway **for the purpose of depriving persons of Somali descent and origin and Hispanic persons of the equal protection of the laws**. The purpose of the roving, disguised patrols was to stop, interrogate, seize, and remove people who appeared Somali or Hispanic, irrespective of citizenship or immigration status, and to intimidate those communities into silence. A federal court has found that these Defendants' agency adopted a policy authorizing "investigatory stops based on ethnicity or race without reasonable suspicion," that agents "approached people on the street, or pulled them over in their vehicles . . . often without identifying themselves," that "[t]he only salient factor in these cases was the individual's race or ethnicity," and that officers "stopped Somali and Hispanic individuals without reasonable suspicion while they did not stop similarly situated nearby white individuals."

339. The disguise served that unlawful purpose directly. Concealment of identity was the mechanism by which Defendants secured impunity for race-based stops and violence: it deprived victims, witnesses, and independent investigators of the ability to identify who had violated their rights; it prevented state and local investigators from identifying agents involved in shootings and other abuse of people who the agents decided to accost; and it made the perpetrators indistinguishable from criminals impersonating immigration officers, a phenomenon the FBI had itself documented and warned DHS about.

340. Renee was killed in the course of these Defendants' disguised movements along that public highway. She was injured in her person and property by acts done in furtherance of the disguised conspiracy: she was unlawfully confined in her vehicle by disguised men whose authority she had no means of verifying; she was ordered from her car without lawful basis, because she was observing and alerting her neighbors to the presence of federal agents engaged in discriminatory and unlawful conduct; and when she attempted to drive slowly away, with no one in her path, she was shot at least three times and killed by a masked agent.

341. Plaintiff Rebecca Good was injured in her person by the same disguised conduct. She was confronted on that public street by masked men whose authority she had no means of verifying and some of whose identities remain unknown to her for that reason, she was standing within a few feet of the vehicle into which one of them fired three rounds, and she was deprived of the ability to identify the men who killed her partner in front of her. She was injured as pled above, and is entitled to recover her own damages.

342. Plaintiffs are entitled to recover damages under 42 U.S.C. § 1985(3), and Defendants' malicious, willful, and wanton conduct warrants punitive damages.

## COUNT III

## 42 U.S.C. § 1986, Neglect and Refusal to Prevent the Wrongs of the § 1985 Conspiracy

**(Both Plaintiffs Against Defendants Miller, Noem, Homan, Lyons, and Bovino)**

343. Plaintiffs incorporate by reference each of the foregoing paragraphs.

344. Section 1986 provides that "[e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured . . . for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented." 42 U.S.C. § 1986.

345. The wrongs of a § 1985 conspiracy were about to be committed. The preceding allegations plead conspiracies in violation of § 1985(3) whose overt acts included race-based stops, seizures, and violence, carried out by masked and unidentified agents roving the public streets, against people of Somali origin and Hispanic people and against the neighbors and allies who observed and defended them.

346. Each of these Defendants knew what Operation Metro Surge was for. The President had said so publicly and repeatedly, in terms no participant could have misunderstood: that Somalis were garbage, that they contributed nothing, that he did not want them in his country, that Minnesota was a hellhole and "[t]he Somalians should be

out of here." Defendant Miller had said in public that the presence of a Somali population in Minnesota was itself the injury to be remedied. Each of these Defendants held a position whose entire function was to carry out the President's stated wishes, and each acted within days of the statements. The Department's own official communications and the White House's own releases described the operation in the ethnic terms the President had used.

347. Each of these Defendants also knew how the operation was being carried out, because each was told, repeatedly, through every channel available. Before Renee was killed, the Defendants had received: complaints to the Department that Defendant Bovino instructed agents to engage in racial profiling, and the warning from his Los Angeles command that his tactics could result in fatalities; judicial findings and orders entered against Defendant Bovino's Chicago command in the weeks before he was dispatched to Minneapolis; the Federal Bureau of Investigation's warning that masked, unidentified agents were indistinguishable from the violent criminals then impersonating them; the State of Minnesota's written notice that their agents' concealment of vehicle license plates was unlawful; 911 calls from residents reporting unidentified masked men and apparent kidnappings; a letter from Representative Ilhan Omar addressed to two of them documenting blatant racial profiling, an egregious level of unnecessary force, the arrest of United States citizens, and enforcement that appeared designed for social media; and the daily operational calls in which they participated, on which agents were ordered into neighborhoods to force confrontations with observers. The reports were consistent, they were numerous, and they described the operation these Defendants were running.

348. Defendant Noem had that knowledge in the fullest measure. She commanded the Department that designed and executed the operation, participated in the daily calls on which it was directed, and published its purpose in the Department's own official communications in the President's terms. She had established the policies under which its agents concealed their identities and their license plates, and she had selected Defendant Bovino for the field command with the fatality warnings, the racial-profiling complaints, and the Chicago judicial findings already in hand. She received Representative Omar's December 12, 2025 letter, addressed to her, along with the remainder of the warnings pleaded above.

349. Defendant Lyons had the same knowledge. The components that executed the operation's stops, seizures, and raids answered to him, including the special response team to which Defendant Ross was assigned, and he promoted the operation publicly as the largest his agency had ever conducted while it was stopping Minneapolis residents because of how they looked. The quota directives and the instruction to agents to "turn up the creative knob up to 11" ran through his agency. He knew from the Chicago command dispute that Defendant Bovino had rejected targeted enforcement in favor of full-scale street operations and claimed to answer to authority outside the ordinary chain of command. He participated in the daily operational calls, and Representative Omar's letter was addressed to him as well as to Defendant Noem.

350. Defendant Miller had knowledge that those wrongs were about to be committed, and greater knowledge than anyone else outside the Department. He ran the daily conference calls on which the operation was directed, demanded daily progress

reports from the enforcement agencies, and set the arrest quotas that drove the roving-patrol method. He knew, because he ordered it, that agents were being dispatched to areas of Minneapolis where observers and protesters were concentrated for the purpose of forcing confrontations with them, and he told the participants on those calls that those resisting the operation "need to be vanquished by any force necessary." He has himself acknowledged that the White House issued protocols governing which federal personnel performed which functions in Minneapolis, and that the White House was evaluating compliance with those protocols.

351. Defendant Miller had power to prevent or aid in preventing the wrongs. He exercised, in practice, the authority to direct the Department's field operations; officials who did not carry out his orders were threatened with removal, and officials who resisted were removed. A person who can order agents into a neighborhood can order them out of it. He could have countermanded the roving-patrol method, the quota directives, and the dispatch orders he had himself issued; he could have directed that agents identify themselves and comply with the Department's own use-of-force policy; and he could have declined to escalate the operation in January 2026. He did none of those things. He escalated instead.

352. Defendant Homan had knowledge that those wrongs were about to be committed. He designed and publicly promised the method (the city surge, the flooded zone, the stop premised on a person's "physical appearance") before Minnesota was selected, and he announced the Minnesota escalation on the day the President called Somali immigrants garbage. He knew what lawful enforcement looked like, because he had

described it himself in 2017 as targeted enforcement directed at specific individuals rather than neighborhood raids or sweeps. As the senior official charged by the President with directing the national enforcement campaign, he had the power to prevent or aid in preventing the wrongs of the conspiracy, and he ultimately demonstrated that power by terminating the operation in February 2026, after two United States citizens had been shot dead on the streets of Minneapolis. He neglected and refused to exercise that power before Renee was killed.

353. Defendants Noem and Lyons likewise had power to prevent or aid in preventing the wrongs. Defendant Noem commanded the Department; Defendant Lyons commanded the agency and its officers. Either could have rescinded the masking policy and the plate concealment policy; enforced the Department's own 2023 use-of-force policy and the identification and warning requirements it contains; declined to deploy, or withdrawn, Defendant Bovino; ended the roving-patrol method and the quota directives; disciplined the agents identified in the documented incidents; ended the embedding of the private propagandists whose filming privileges the operation's victims were threatened with arrest for imitating; or declined the January 2026 escalation. Each of those measures lay squarely within their ordinary and lawful authority.

354. Defendant Bovino had knowledge that the wrongs were about to be committed, including from a federal court before he set foot in Minneapolis. On November 20, 2025, sixteen days before Operation Metro Surge began, the judge presiding over the Chicago operation he commanded found that he had engaged in "outright lying" about the use of force, that the conduct of agents under his command shocked the conscience, and

that body-camera footage contradicted their official reports; that court ordered agents under his command to wear body cameras and to display visible identifiers. The Department had also received complaints that he instructed agents to engage in racial profiling, he had been warned during his Los Angeles command that his tactics could result in fatalities, and he had twice before been subject to court orders arising from racial profiling in operations he led. Defendant Bovino had the most direct power of anyone named in this Count to prevent or aid in preventing the wrongs, because he commanded the agents who committed them, and he exercised that command outside the ordinary chain: when Defendant Lyons told him that Lyons was in charge and urged two weeks of targeted operations before full-scale enforcement, Defendant Bovino wrote in a contemporaneous email that he "corrected him," that "i reported to Corey Lewandowski," and that he "declined his suggestion." He could have ordered the agents under his command to identify themselves, as a federal court had already ordered him to do; ended the roving-patrol method he brought with him from Los Angeles and Chicago; and required compliance with the Department's own 2023 use-of-force policy, including its prohibitions on discharging a firearm at the operator of a moving vehicle and on an agent placing himself in a vehicle's path. Each of those measures lay squarely within his ordinary and lawful authority as field commander. He neglected and refused to take any of them.

355. Each of these Defendants neglected and refused to act on what he or she knew. In the weeks between the operation's launch in early December 2025 and the killing of Renee Good on January 7, 2026, and with every warning described above in hand, these Defendants deployed approximately 2,100 additional agents; proclaimed the operation the

largest in the Department's history; sent Defendant Bovino to take command of the Minneapolis streets; rescinded nothing; corrected nothing; and disciplined no one. Their response to being told that the operation was targeting people by ethnicity was to make it larger. To this day, no agent, officer, or commander has been disciplined for any act of the operation.

356. On January 7, 2026, Renee Good was confronted on a public street by masked, unidentified agents executing the operation's roving-patrol method, and was shot three times and killed. The operation's race-based stops and seizures of people of Somali descent and origin and Hispanic people continued before and after.

357. Reasonable diligence would have prevented her death. The killing was accomplished through the practices the warnings had identified: unidentified, masked agents; a roadway confrontation initiated without lawful basis; force used against an observer; and shots fired in violation of the Department's own mandatory policies. Enforcement of Defendants' existing written policies alone (identification, verbal warnings, no discharge of a firearm at the operator of a moving vehicle, no self-positioning in a vehicle's path) would have prevented it; so would any one of the corrective measures pleaded above that these Defendants declined to take.

358. As a direct and proximate result of the neglect and refusal of Defendants Miller, Noem, Homan, Bovino, and Lyons to prevent the wrongs, Renee suffered the injuries and death as described above, and her next of kin suffered and will continue to suffer the losses there pleaded. Their conduct was malicious, willful, wanton, and recklessly indifferent to federally protected rights, warranting punitive damages.

359. As a direct and proximate result of the same neglect and refusal, Plaintiff Rebecca Good suffered the injuries pleaded above. Had any of these Defendants exercised reasonable diligence, the confrontation on Portland Avenue would not have occurred, and Becca Good would not have been placed in the path of federal gunfire or made to watch her partner die.

**COUNT IV**

**Fourth Amendment, Excessive Force, *Bivens* Claim**

**(Plaintiff Ganger Against Defendant Ross)**

360. Plaintiffs incorporate by reference each of the foregoing paragraphs.

361. The Fourth Amendment guarantees the right of the people to be secure in their persons against unreasonable seizures. The application of deadly force is a seizure, and it is unreasonable unless the officer has probable cause to believe that the suspect poses a threat of serious physical harm to the officer or others.

362. This claim arises in the same context as *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971): a Fourth Amendment claim for damages by an individual against a rank-and-file federal law enforcement officer for an unreasonable seizure of her person carried out on the street in the course of ordinary domestic law enforcement activity, unauthorized by any warrant or statute.

363. Defendant Ross seized Renee Nicole Macklin Good within the meaning of the Fourth Amendment when he fired at least three rounds into her occupied vehicle, striking and killing her.

364. That seizure was objectively unreasonable. At the moment Defendant Ross fired each of his three shots:

a. Renee Good was unarmed, was suspected of no crime, and was not the subject of any law enforcement investigation.

b. She had committed no offense that Defendant Ross had any authority to enforce, and her stopped vehicle was not obstructing traffic; approximately eleven vehicles, including Ross's own, had driven around it.

c. She had spoken to Defendant Ross moments earlier in calm and conciliatory terms: "That's fine dude. I'm not mad at you. I'm not mad at any of you."

d. She had turned her wheels away from Defendant Ross and was driving slowly away from him and from the other agents.

e. Defendant Ross had moved his legs and body out of the vehicle's path before he fired, and then leaned forward toward the vehicle for the purpose of improving his shooting position.

f. No person, including Defendant Ross, was in the path of the vehicle at the moment any shot was fired.

g. The second and third shots (including the fatal shot to the left temple) were fired through the open driver's side window from the side of the vehicle as it moved away.

h. Deadly force could not have reduced any risk that Defendant Ross claims to have perceived; shooting the driver of a moving vehicle predictably created an out-of-control vehicle, which is precisely what occurred.

365. Defendant Ross's conduct violated clearly established law. It is and long has been clearly established that an officer may not use deadly force against the driver of a vehicle that is moving away from him and poses no immediate threat of serious physical harm, and that deadly force may not be used solely to prevent escape. Defendant Ross's own agency's mandatory policies prohibit the use of deadly force solely to prevent the escape of a fleeing individual, prohibit discharging a firearm at the operator of a moving vehicle, prohibit agents from intentionally placing themselves in harm's way, and require agents to consider the implications of an out-of-control conveyance before firing at a driver.

366. Defendant Ross also unreasonably created the danger he then invoked: he positioned himself at the front left of an occupied vehicle surrounded by shouting agents; he occupied one of his hands with a cell phone he was using to film; and he leaned toward the moving vehicle rather than away from it.

367. As a direct and proximate result of Defendant Ross's unconstitutional seizure, Renee suffered three gunshot wounds, severe conscious physical and emotional pain and suffering, a total loss of the enjoyment of life, and death. Her next of kin have suffered and will continue to suffer pecuniary loss.

368. Defendant Ross acted with malice, willfulness, and reckless indifference to Renee Good's constitutional rights, warranting punitive damages.

## STATE-LAW CLAIMS UNDER THE WESTFALL ACT

369. The Minnesota tort claims that follow are brought by both Plaintiffs against Defendant Ross and the John Doe Federal Agents individually, under the tort law of

Minnesota, for conduct that also violated the Constitution of the United States. They proceed under two independent theories.

370. These claims are permitted by the Westfall Act. The Act's exclusive-remedy provision, 28 U.S.C. § 2679(b)(1), does not apply to any claim "which is brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2)(A); *see Buchanan v. Barr*, 71 F.4th 1003, 1012–18 (D.C. Cir. 2023) (Walker, J., concurring). Each of the following claims is brought for a violation of the Constitution: the seizure, confinement, and killing of Renee Good violated the Fourth Amendment, as pleaded in the Fourth Amendment claim above and incorporated into each Count below. Because the tortious conduct of Defendant Ross and the John Doe Federal Agents violated Renee Good's constitutional rights, Plaintiffs may state claims under state tort law, as that has been the traditional method of obtaining relief when federal employees' tortious acts violate the Constitution.

371. Nothing in these Counts is inconsistent with Plaintiffs' separate claims against the United States under the Federal Tort Claims Act arising from the same events.

**COUNT V**

**Westfall Act and Minnesota Tort Law, Wrongful Death (Minn. Stat. § 573.02)**

**(Plaintiff Ganger Against Defendant Ross and the John Doe Federal Agents)**

372. Plaintiffs incorporate by reference each of the foregoing paragraphs.

373. Under Minnesota law, "[w]hen death is caused by the wrongful act or omission of any person," the trustee appointed for the decedent's next of kin "may maintain

an action therefor if the decedent might have maintained an action, had the decedent lived, for an injury caused by the wrongful act or omission." Minn. Stat. § 573.02, subd. 1.

374. Renee's death was directly and proximately caused by the wrongful acts and omissions of Defendant Ross and the John Doe Federal Agents at the scene, including: (a) the battery Defendant Ross committed when he shot Renee Good three times without justification, as pleaded below; (b) the assault Defendant Ross committed when he pointed his firearm at her and fired without justification, as pleaded below; (c) the false imprisonment of Renee Good by Defendant Ross and the John Doe Federal Agents, as pleaded below; (d) the intentional infliction of emotional distress upon her, as pleaded below; and (e) the negligence of Defendant Ross and the John Doe Federal Agents, including their negligent creation of the dangers that culminated in the shooting and their failure to render or permit medical aid, as pleaded below. Each of those predicate wrongful acts is realleged and incorporated here. Had she lived, Renee Good could have maintained an action for each of them.

375. As trustee, Plaintiff Brent Ganger is entitled to recover all damages recoverable under Minn. Stat. § 573.02, including recovery "for all damages suffered by the decedent resulting from the injury prior to the decedent's death," Minn. Stat. § 573.02, subd. 1, and the pecuniary loss resulting from her death, which encompasses the full value of the contributions Renee Good would have made to her surviving next of kin, including lost income and economic support, the loss of the value of her services, and the loss of her advice, comfort, assistance, and protection. The recovery is for the exclusive benefit of the

surviving next of kin, proportionate to the pecuniary loss severally suffered by the death. Minn. Stat. § 573.02, subd. 1.

376. Renee Good suffered immense conscious physical, mental, and emotional pain and suffering between the agents' unlawful confinement of her and her loss of consciousness, and her next of kin, her three minor children, her parents, and her four siblings, have suffered and will continue to suffer pecuniary loss, including the loss of her economic support, services, advice, comfort, assistance, protection, and companionship.

377. The wrongful acts and omissions that caused Renee Good's death also violated her rights under the Fourth Amendment to the Constitution of the United States, as pleaded above. This claim is therefore brought for a violation of the Constitution of the United States within the meaning of 28 U.S.C. § 2679(b)(2)(A), and Defendant Ross and the John Doe Federal Agents are personally liable notwithstanding 28 U.S.C. § 2679(b)(1).

**COUNT VI**

**Westfall Act and Minnesota Tort Law, Battery**

**(Plaintiff Ganger Against Defendant Ross)**

378. Plaintiffs incorporate by reference each of the foregoing paragraphs.

379. In Minnesota, a battery is an intentional, unpermitted, offensive contact with another person.

380. Defendant Ross committed a battery against Renee Good when he intentionally shot her three times, without her consent and without any legal justification. In doing so he engaged in a series of acts that violated the Fourth Amendment, mandatory DHS policies, and universally accepted law enforcement standards, including: positioning

himself at the front left of her vehicle; filming the encounter with his cell phone, fully occupying one of his hands; leaning toward her vehicle as she attempted to drive slowly around him, to position himself to shoot; firing his first shot into the bottom left of the windshield from a position out of the vehicle's path; and firing his second and third shots through the open driver's side window as she slowly drove past him.

381. Defendant Ross's use of force was not privileged. Renee Good posed no imminent threat of death or serious bodily injury to Defendant Ross or to anyone else; no person was in the vehicle's path when any shot was fired; and each shot was fired in violation of mandatory DHS policies prohibiting deadly force against fleeing subjects, prohibiting the discharge of firearms at the operator of a moving vehicle, and prohibiting officers from intentionally placing themselves in harm's way.

382. As a direct and proximate result of Defendant Ross's battery, Renee suffered three gunshot wounds, conscious physical, mental, and emotional pain and suffering, a total loss of the enjoyment of life, and death, and her next of kin have suffered the pecuniary losses described above.

383. That battery also violated Renee Good's rights under the Fourth Amendment, as pleaded in the Fourth Amendment claim above. This claim is therefore brought for a violation of the Constitution of the United States within the meaning of 28 U.S.C. § 2679(b)(2)(A), and Defendant Ross is personally liable notwithstanding 28 U.S.C. § 2679(b)(1).

## COUNT VII

### Westfall Act and Minnesota Tort Law, Assault

### (Plaintiff Ganger Against Defendant Ross)

384. Plaintiffs incorporate by reference each of the foregoing paragraphs.

385. In Minnesota, an assault is an unlawful threat to do bodily harm to another with the present ability to carry the threat into effect.

386. Defendant Ross committed an assault against Renee Good when, without justification, he drew his firearm, pointed it at her, and fired into her vehicle, evincing an unlawful threat to do bodily harm to her with the present and demonstrated ability to carry that threat into effect. Renee Good, who posed no threat to anyone, was placed in reasonable apprehension of immediate bodily harm.

387. As a direct and proximate result of Defendant Ross's assault, Renee suffered fear, terror, and severe emotional distress in the final moments of her life, together with the injuries and death described above, and her next of kin have suffered the pecuniary losses described above.

388. That assault also violated Renee Good's rights under the Fourth Amendment, as pleaded in the Fourth Amendment claim above. This claim is therefore brought for a violation of the Constitution of the United States within the meaning of 28 U.S.C. § 2679(b)(2)(A), and Defendant Ross is personally liable notwithstanding 28 U.S.C. § 2679(b)(1).

## COUNT VIII

### Westfall Act and Minnesota Tort Law, False Imprisonment

### (Plaintiff Ganger Against Defendant Ross and the John Doe Federal Agents)

389. Plaintiffs incorporate by reference each of the foregoing paragraphs.

390. In Minnesota, false imprisonment consists of (1) words or acts by the defendant intended to confine the plaintiff, (2) actual confinement, and (3) awareness by the plaintiff that she is confined. The confinement is unlawful where it is not privileged by lawful authority.

391. Defendant Ross and the John Doe Federal Agents falsely imprisoned Renee Good. Although her stopped vehicle did not prevent traffic from proceeding (at least eleven vehicles, including Defendant Ross's own, drove around it), the agents in the pickup truck refused her express invitation to "just go around." Instead they emerged from their vehicle, shouted at her to get out of her car, and aggressively attempted to open her driver's side door and reached inside her window, while Defendant Ross walked around and then in front of her vehicle. Through these acts and commands they confined Renee Good in her vehicle, and she was aware of her confinement.

392. Defendant Ross and the John Doe Federal Agents had no lawful justification to confine her. ICE agents are not empowered to enforce Minnesota traffic laws, and the agents possessed no evidence or information that Renee Good had engaged in any unlawful obstructive conduct. Defendant Ross himself had easily driven around her vehicle. The agents confined her because she engaged in lawful activity protected by the First Amendment: honking her horn to alert her neighbors to ICE's presence. When she

attempted to drive slowly out of the area in which she was unlawfully confined, Defendant Ross shot her at least three times.

393. As a direct and proximate result of the false imprisonment, Renee Good suffered a deprivation of her liberty, fear, and severe emotional distress, together with the injuries and death described above, and her next of kin have suffered the pecuniary losses described above.

394. That false imprisonment also violated Renee Good's rights under the Fourth Amendment, as pleaded in the Fourth Amendment claim above. This claim is therefore brought for a violation of the Constitution of the United States within the meaning of 28 U.S.C. § 2679(b)(2)(A), and Defendant Ross and the John Doe Federal Agents are personally liable notwithstanding 28 U.S.C. § 2679(b)(1).

## COUNT IX

### Westfall Act and Minnesota Tort Law, Intentional Infliction of Emotional Distress

### (Both Plaintiffs Against Defendant Ross and the John Doe Federal Agents)

395. Plaintiffs incorporate by reference each of the foregoing paragraphs.

396. In Minnesota, a defendant is liable for intentional infliction of emotional distress where (1) the conduct was extreme and outrageous, (2) the conduct was intentional or reckless, (3) it caused emotional distress, and (4) the distress was severe. Conduct is extreme and outrageous when it is so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community.

397. Defendant Ross and the John Doe Federal Agents intentionally inflicted emotional distress upon Renee Good. Their unlawful confinement of a woman who had

spoken to them calmly and cordially, their profane commands, their attempt to wrench open her car door, Defendant Ross's decision to shoot her three times as she attempted to drive slowly away, and the agents' refusal to render or permit medical aid as she lay dying constitute extreme and outrageous conduct that passes the boundaries of decency and is utterly intolerable in a civilized community.

398. That conduct was intentional or reckless, and it caused Renee Good severe emotional distress (including terror, anguish, and the conscious apprehension of her own death) from the moment her unlawful confinement began until she lost consciousness.

399. As a direct and proximate result, Renee Good suffered severe emotional distress, together with the injuries and death described above, and her next of kin have suffered the pecuniary losses described above.

400. Defendant Ross and the John Doe Federal Agents also intentionally inflicted emotional distress upon Plaintiff Rebecca Good. Defendant Ross shot Becca Good's partner three times without justification, in Becca's presence and a few feet from where she stood, and he and the John Doe Federal Agents then refused Renee medical aid and drove away a bystander who identified himself as a physician and offered to help. Shooting a woman to death in front of her partner, and then preventing anyone from trying to save her while her partner stood in the street, is conduct that passes the boundaries of decency and is utterly intolerable in a civilized community.

401. That conduct was intentional or reckless. Defendant Ross knew Becca Good was present: he had circled the vehicle filming and had interacted with her directly

moments before. He and the John Doe Federal Agents knew that bystanders, including Becca, were watching when they refused aid.

402. As a direct and proximate result, Becca Good has suffered severe emotional distress, including post-traumatic stress disorder, insomnia, and the continuing physical manifestations pleaded above.

403. That conduct also violated Renee Good's rights under the Fourth Amendment, as pleaded in the Fourth Amendment claim above. This claim is therefore brought for a violation of the Constitution of the United States within the meaning of 28 U.S.C. § 2679(b)(2)(A), and Defendant Ross and the John Doe Federal Agents are personally liable notwithstanding 28 U.S.C. § 2679(b)(1).

**COUNT X**

**Westfall Act and Minnesota Tort Law, Negligence**

**(Plaintiff Ganger Against Defendant Ross and the John Doe Federal Agents)**

404. Plaintiffs incorporate by reference each of the foregoing paragraphs.

405. In Minnesota, the elements of a negligence cause of action are the existence of a duty of care, a breach of that duty, an injury, and causation between the breach and the injury.

406. Defendant Ross and the John Doe Federal Agents owed Renee Good a duty to exercise reasonable care in the conduct of law enforcement operations, including in their use and handling of firearms, their positioning and tactics around an occupied vehicle, and their treatment of a person they had injured. The mandatory standards governing federal

immigration enforcement, including 8 C.F.R. § 287.8 and the mandatory DHS use-of-force policies described above, reflect and inform the standard of care.

407. Although Defendant Ross and the John Doe Federal Agents engaged in intentional unlawful conduct that directly and proximately caused Renee Good's death, they also engaged in negligent conduct that fell far beneath the duties and standard of care they owed her. Defendant Ross engaged in conduct that unreasonably heightened the risk of danger to Renee Good, including: placing himself near the front of her vehicle at a point when she was being confronted by multiple ICE agents; intentionally leaning toward the vehicle as it began to slowly move away from him; filming his encounter with her using a cellular telephone, thereby incapacitating his left hand during the encounter; and failing to consider the implications of an out-of-control conveyance before firing at the operator of a moving vehicle. Each of these acts created an unreasonable risk that Defendant Ross would erroneously feel compelled to use deadly force against her, and each departs from both universally accepted law enforcement practices and the mandatory DHS rules he was obliged to follow.

408. In addition, the agents who exited the pickup truck and Defendant Ross acted negligently in giving Renee Good contradictory instructions and in confronting her from multiple directions while commanding her from her vehicle, thereby heightening the risks to her.

409. Defendant Ross and the John Doe Federal Agents further breached their duties to Renee Good after she was shot. By failing to render immediate medical aid and by affirmatively preventing bystanders, including one who identified himself as a

physician, from rendering aid, they breached their obligation to provide prompt care to a person whom they had gravely injured, an obligation imposed by their common-law duties and by mandatory DHS policy. There was no active threat to any agent and no barrier to the provision of medical care.

410. None of the conduct described in this Count involved the permissible exercise of discretion. The duties these Defendants violated, including the Constitution and the mandatory prohibitions and directives of DHS policy, prescribe specific courses of conduct, and no federal policy confers discretion to violate them.

411. As a direct and proximate result of their negligence, Renee Good suffered three gunshot wounds, conscious physical, mental, and emotional pain and suffering, a total loss of the enjoyment of life, and death, and her next of kin have suffered the pecuniary losses described above.

412. That negligent conduct also violated Renee Good's rights under the Fourth Amendment, as pleaded in the Fourth Amendment claim above. This claim is therefore brought for a violation of the Constitution of the United States within the meaning of 28 U.S.C. § 2679(b)(2)(A), and Defendant Ross and the John Doe Federal Agents are personally liable notwithstanding 28 U.S.C. § 2679(b)(1).

## COUNT XI

### Westfall Act and Minnesota Tort Law, Negligent Infliction of Emotional Distress

### (Plaintiff Rebecca Good Against Defendant Ross and the John Doe Federal Agents)

413. Plaintiffs incorporate by reference each of the foregoing paragraphs.

414. In Minnesota, a plaintiff may recover for negligent infliction of emotional distress upon a showing that she was within the zone of danger of physical impact created by the defendant's negligence, that she reasonably feared for her own safety, and that she consequently suffered severe emotional distress with attendant physical manifestations.

415. Defendant Ross and the John Doe Federal Agents owed Becca Good a duty to exercise reasonable care in the conduct of law enforcement operations on a residential street, including in their use and handling of firearms and in their positioning and tactics around an occupied vehicle beside which she was standing. The mandatory standards governing federal immigration enforcement, including 8 C.F.R. § 287.8 and the mandatory DHS use-of-force policies described above, reflect and inform that standard of care.

416. They breached that duty. Defendant Ross positioned himself at the front left of an occupied vehicle while Renee Good was being confronted by multiple agents; he filmed the encounter with a cellular telephone, incapacitating one hand; he leaned toward the vehicle as it moved slowly away from him, to position himself to shoot; and he fired three rounds into an occupied vehicle on a residential street without considering the implications of an out-of-control conveyance, as mandatory DHS policy required him to do. The agents who exited the pickup truck and Defendant Ross gave Renee Good

contradictory commands and confronted her from multiple directions, heightening the risk to everyone present, Becca Good included.

417. Becca Good was within the zone of danger of physical impact created by that negligence. She was standing a few feet from the rear passenger side of the vehicle when Defendant Ross fired into it, including when he fired the round that entered the bottom left of the windshield, and she was beside the vehicle's path when it careened down the street out of control after he shot its driver. She reasonably feared for her own safety.

418. Becca Good also stood in a close relationship to the person at whom the gunfire was directed. Minnesota permits recovery for distress caused by fearing for another's safety or witnessing serious injury to another where the plaintiff satisfies the zone-of-danger elements and stands in a close relationship to the third-party victim. Becca Good was Renee Good's partner. They moved to Minneapolis together, lived together, and were together raising Renee's six-year-old son. She witnessed Renee's death.

419. As a direct and proximate result of that negligence, Becca Good has suffered severe emotional distress with attendant physical manifestations, including post-traumatic stress disorder, insomnia, panic on waking, traumatic flashbacks, body aches and chest pains, headaches, chills, temperature dysregulation, digestive problems, loss of appetite, and a loss of at least fifteen pounds, for which she is under the ongoing care of a therapist and a psychiatrist.

420. That negligent conduct also violated Renee Good's rights under the Fourth Amendment and was part of the same course of conduct that violated the rights pleaded in Plaintiffs' federal claims above. This claim is therefore brought for a violation of the

Constitution of the United States within the meaning of 28 U.S.C. § 2679(b)(2)(A), and Defendant Ross and the John Doe Federal Agents are personally liable notwithstanding 28 U.S.C. § 2679(b)(1).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Brent Ganger, as Trustee for the Next of Kin of Renee Nicole Macklin Good, and Rebecca Good respectfully pray for judgment against Defendants as follows:

a. For compensatory damages in an amount to be proven at trial, including all damages recoverable as a matter of federal law under 42 U.S.C. §§ 1985(3) and 1986 and under the Fourth Amendment, including but not limited to Renee Nicole Macklin Good's conscious pain and suffering before death, her loss of life, her lost accumulations, and the pecuniary loss suffered by her next of kin, and all damages recoverable under Minn. Stat. § 573.02;

b. For all compensatory damages recoverable under the Minnesota tort law claims pleaded above, including damages for Renee Nicole Macklin Good's conscious pain and suffering before death and for the pecuniary loss suffered by her next of kin, and all damages recoverable under Minn. Stat. § 573.02;

c. For all compensatory damages recoverable by Plaintiff Rebecca Good in her own right, including damages for severe emotional distress, its physical manifestations, past and future medical and psychological care, and the costs of securing her home;

d. For punitive damages against each Defendant in an amount sufficient to punish and deter;

e. For prejudgment and post-judgment interest as allowed by law;

f. For reasonable attorneys' fees and the costs of this action; and

g. For all such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all claims and issues so triable.

| | |
|---|---|
| Date: October 1, 2026<br><br>*/s/ Kevin Riach* | Respectfully submitted,<br><br>*/s/ Benjamin Berkman* |
| Kevin Riach<br>(MN Bar # 0389277)<br>The Law Office of Kevin C. Riach, PLLC<br>125 Main Street SE, Suite 339<br>Minneapolis, Minnesota 55414<br>kevin@riachdefense.com<br>(612) 203-8555 | Antonio Romanucci (*pro hac vice* forthcoming)<br>(Illinois ARDC # 6190290)<br>Daisy Ayllón (*pro hac vice* forthcoming)<br>(Illinois ARDC # 6317048)<br>Sarah Raisch (*pro hac vice* forthcoming)<br>(Illinois ARDC # 6305374)<br>Benjamin Berkman (*pro hac vice* forthcoming)<br>(Illinois ARDC # 6329445)<br>Stephen Weil (*pro hac vice* forthcoming)<br>(Illinois ARDC # 6291026)<br><br>Romanucci & Blandin, LLC<br>321 N. Clark Street, Suite 900<br>Chicago, Illinois 60654<br>aromanucci@rblaw.net<br>(312) 458-1000<br><br>*Counsel for Plaintiffs* |